DETERMINED IN THE

# SUPREME COURT,

## JANUARY TERM, 1874.

### PRESENT:

HON. DAVID NOGGLE, CHIEF JUSTICE.
HON. W. C. WHITSON, ⎱JUSTICES.
HON. M. E. HOLLISTER, ⎰

---

## JAMES PICKETT, PLAINTIFF IN ERROR, v. THE UNITED STATES, DEFENDANT IN ERROR.

TERRITORIAL COURTS.—The district courts of the territory are not United States courts, but territorial courts with the jurisdiction of the circuit and district courts of the United States, conferred upon them by law.

JURISDICTION—SUBJECT-MATTER.—It must be determined from the subject-matter of the action, and not from the title of the court, whether the action is one arising under the laws of the United States or of the territory.

PREJUDICE—CRIMINAL LAW.—No matter of form, not tending to the prejudice of the defendant in a criminal case, will be regarded.

INDIAN TRIBES—TRADE AND INTERCOURSE.—It was by virtue of the act of congress of June 5, 1850, and not the act of June 30, 1834, that the law regulating trade and intercourse with the Indian tribes east of the Rocky mountains, or such provisions of the same as were applicable, were extended over the Indian tribes of Oregon.

INDIANS.—The act of congress organizing the territory of Oregon, reserved to the government of the United States the right to make any regulations respecting the person and property of the Indians, which it would have been competent for the government to make had the act never been passed.

IDEM.—This territory having been originally a portion of Oregon, and congress, in organizing it, having reserved the right to make such regulations respecting the persons and property of the Indians, as in the organization of Oregon territory, the act of 1850, and the provisions of the act of 1834, so far as applicable, remain in force in this territory.

INDIANS—INDIAN TRIBES.—The provisions of the twenty-fifth section of the act of congress of 1834, regulating trade and intercourse with the Indians, is as applicable to the Indian tribes in this territory as any portion of the act; hence, the territory of Idaho is Indian country, but only so far as the rights of the persons and property of the Indian tribes are concerned, and therefore, to that extent, within the sole and exclusive jurisdiction of the United States.

ERROR to the district court of the first judicial district.

*Alanson Smith,* for the plaintiff in error.

*J. W. Huston, United States district attorney,* for the respondent.

WHITSON, J., delivered the opinion. NOGGLE, C. J., and HOLLISTER, J., concurred.

James Pickett was indicted, tried, and convicted at the May term, 1873, of the district court of the first judicial district of the territory, held in Nez Perce county, for the murder of an Indian woman of the Nez Perce tribe, committed in Shoshone county, and upon such conviction was sentenced to suffer the extreme penalty of the law. Defendant now brings his writ of error to this court, and alleges as error committed by the court below: 1. That there is no such court as "the district court of the United States of America for the first judicial district of Idaho territory." 2. That the defendant was amenable to the laws of the territory, and not to the laws of the United States.

None of these questions were raised in the court below and no exception of any kind taken to any action of the court in the trial of the case. By the ninth section of the organic act of the territory (12 U. S. Stat. at Large, page 808), it is provided that the territory shall be divided into three judicial districts and that a district court shall be held in each of said districts; and throughout the whole of that section, and in fact the whole of the acts of congress on the subject, these courts are designated as district courts of the

territory, so that we feel warranted in designating them as the "district courts of the territory." We think that in all cases where these courts are exercising their jurisdiction as circuit or district courts of the United States, it is sufficient to lay the venue substantially thus: "In the district court of the judicial district of Idaho territory." And when exercising jurisdiction in cases arising under the laws of the territory, it is proper to lay the venue thus: "In the district court of Idaho territory, in and for ———— county."

In the case at bar the United States district attorney laid the venue in the indictment, substantially as designated by the first form, except that he inserted "the United States of America," making it read: "In the district court of the United States of America, for the first judicial district of Idaho territory," which insertion was entirely unnecessary, and can be treated as nothing more serious than mere surplusage, and could indicate nothing further than that the district court was sitting upon the business of the United States, which is more properly deduced from the subject-matter of an action, than from any title or mere name given to the court.

The only difference in the title of the court when acting in cases arising under the laws of the United States and those of the territory is, that in the former it is not essential to state the county, as the court sits in but one place in each judicial district; while in the latter, the court must sit in the proper county. (See Acts of Congress, 11 U. S. Stat. at Large, p. 49, sec. 5; 12 Id., p. 811, sec. 9; 11 Id., p. 366; also 2 Sess. Laws of I. T., p. 83, title 2, and amendments thereto. Also Act of Congress, 14 U. S. Stat. at Large, p. 427, sec. 1.)

The district courts of the territory are not United States courts, but territorial courts, having the jurisdiction of the circuit and district courts of the United States conferred upon them. This, however, is not a jurisdictional question, there being nothing wanting to determine what court was taking jurisdiction of the offense charged against the defendant. The objection we have been considering does not proceed upon the ground that a definite and given court had

no jurisdiction, but upon the converse proposition that an indefinite and uncertain court has taken jurisdiction of a definite and certain offense.    The title of the court was only a matter of form, which could in no way have prejudiced the defendant in his rights, and his objection raised here for the first time comes too late.    (17 U. S. Stat. at Large, p. 198, sec. 8.)

The consideration of the second objection involves a question of great importance, not only as an abstract proposition, but also as upon its solution depends the life of the defendant, than which no more serious question can arise in any court for decision.

We find the question entirely new, and therefore are not aided by the decision of any of the learned courts which usually furnish precedents for the determination of most of the questions presented for our determination, except so far as we have been able to glean some light by analogy.

By the first section of the act of congress of June 30, 1834 (4 U. S. Stat. 729), it is provided, that all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana or the territory of Arkansas, for the purposes of this act shall be taken and deemed to be Indian country.    The supreme court of the United States in giving an interpretation to this section says: " The Indian territory is admitted to compose a part of the United States." (*Cherokee Nation* v. *Georgia,* 5 Pet. 171.)    " The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the union.    (*Worchester* v. *Georgia,* 6 Id. 547.)    "They are not foreign but domestic dependent nations.    They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession, when their right of possession ceases." (*Cherokee Nation* v. *Georgia,* 5 Id. 171.)    By the twenty-fourth section of the same act it is provided that, " for the sole purpose of carrying this act into effect, all that part of the Indian country west of the Mississippi river, that is bounded north by the north line

of the lands assigned to the Osage tribe of Indians pro-
duced east to the state of Missouri, west by the Mexican
possessions, south by Red river, and east by the west
line of the territory of Arkansas and the state of Missouri,
shall be, and hereby is, annexed to the territory of Arkan-
sas; and that for the purpose aforesaid, the residue of the
Indian country west of the said Mississippi river shall be,
and hereby is, annexed to the judicial district of Missouri."

    *         *         *         *         *         *         *

By the twenty-fifth section of the same act it is provided,
that so much of the laws of the United States as provides
for the punishment of crimes committed within any place
within the sole and exclusive jurisdiction of the United States
shall be in force in the Indian country; provided, the same
shall not extend to crimes committed by one Indian against
the person or property of another Indian. At the time of
the passage of the act of 1834, none of the country which
was subsequently organized into the territory of Oregon
was embraced by the provisions of this act within the In-
dian country, it being at that time jointly occupied by the
United States and Great Britian. By the act of congress
organizing the territory of Oregon (9 U. S. Stat. at Large,
p. 323), it is provided among other things: "That nothing
in this act contained shall be construed to impair the rights
of person or property now pertaining to the Indians in said
territory, so long as such rights shall remain unextin-
guished by treaty between the United States and such In-
dians, or to effect the authority of the government of the
United States to make any regulation respecting such In-
dians, their lands, or other rights by treaty, law, or other-
wise, which it would have been competent to the govern-
ment to make if this act had never been passed."

It might be pertinent just here to inquire, what were the
rights of the Indians as to their persons and property when
this act was passed, and what power would the general gov-
ernment have possessed relative thereto, had this act never
been passed? The answer seems almost unnecessary.
There can be no doubt that the power of congress in the
premises remained untrammeled. Congress did legislate

upon the subject subsequently, and by the act of June 5, 1850, 9 U. S. Stat. at Large 437, sec. 5, made the following provision: "That the law regulating trade and intercourse with the Indian tribes east of the Rocky Mountains, or such provisions of the same as may be applicable, be extended over the Indian tribes in the territory of Oregon." The territory of Washington was subsequently organized out of a portion of Oregon, and the exact provision inserted in her organic act as that of Oregon respecting the authority of the United States relative to the Indians.

In 1855 a treaty was made with the Nez Perce tribe of Indians residing within the then territories of Oregon and Washington, and ratified in 1859, by the provisions of which they were to be restricted in their rights to a reservation within the limits of Washington territory, with the following exception: "The exclusive right of taking fish in all the streams when running through or bordering said reservation, is further secured to said Indians, as also the right of taking fish at all usual and accustomed places in common with the citizens of the territory, and of erecting temporary buildings for curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle, upon any unclaimed lands." The tribe also acknowledged their dependence upon the government of the United States, and promise to be friendly, etc.

In 1863 a supplemental treaty was made with the Nez Perce tribe of Indians, by article 8 of which it is provided as follows: "It is also understood that the aforesaid tribe do hereby renew their acknowledgments of dependence upon the government of the United States, their promises of friendship and other pledges, as set forth in the eighth article of the treaty of June 11, 1855, and further, that all the provisions of said treaty which are not abrogated or specifically changed by any article herein contained, shall remain the same, to all intents and purposes, as formerly, the same obligations resting upon the United States, the same privileges continuing to the Indians outside of the reservation, and the same rights secured to citizens of the United States as to right of way upon the streams, and

over the roads, which may run through said reservation as therein set forth."

The organic act of Idaho territory was passed by congress in 1863, embracing within its limits that portion of Washington territory upon which was located the Nez Perce reservation, and that portion of the act respecting the rights of the Indians is much broader and stronger in favor of the authority of the general government in the premises than were the organic acts of Oregon and Washington territories. The act provides "that nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribes, is not without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the territory of Idaho, until said tribe shall signify their assent to the president of the United States, to be included within said territory, or to affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise which it would have been competent for the government to make if this act had never passed."

After a thus lengthy quotation from the acts of congress upon the subject of the rights of the Indians within the territory, we come now to consider wherein the United States have at any time surrendered their authority over the persons and property of the Indian tribes located within this territory. The intercourse act, as will be seen, was extended over the Indian tribes of Oregon so far as applicable.

And here arises the question as to what provisions of the intercourse act were applicable to the existing state of affairs in Oregon at the time its provisions were extended over that territory. It can not be questioned but that it

was as necessary to extend the provisions of the twenty-fifth section of the act of 1834 over the Indian tribes of the territory as any portion of the act, and if so, that country, so far as the rights of the Indian tribes were concerned, were applicable; and the country, as affecting their rights of person and property, was Indian country. And why not? The whole country was inhabited by wild and barbarous savages, and was in point of fact, if not in point of law, Indian country; and could there be anything inapplicable in extending its provisions over Oregon, so far as Indian tribes might be affected in their rights of person or property? The very condition of the country suggests the reasonableness of the intention of congress to that end.

But it could not be applicable to the whites, in their intercourse with one another; for while it has been the policy of the government, almost from its very inception, to control as well as protect the Indian tribes, it has also been its policy to open up this vast extent of country to settlement by the whites. Therefore we are led to the conclusion, inevitably, we think, that, so far as affecting the rights of person and property of Indians, it is Indian country, and to that extent within the sole and exclusive jurisdiction of the United States; and if so, all the laws of the United States providing for the punishment of crimes within such sole and exclusive jurisdiction are clearly applicable.

The policy of the general government, in dealing with the Indians, has not been moderated in favor of Indian supremacy, if we may use such a term, but rather to the other extent, of treating them as a dependent race, incapable of and unwilling, to a great extent, to avail themselves of the advantages of civilization and progress. In all the details of their relations to the government, their rights and interests are made subservient to the interests of the government and its citizens; and they are, to every practical purpose, to the government, what the ward is to the guardian. Where, then, is there any inapplicability in trying all those rights affecting the persons or property of the Indians, who have tribal relations, on the United States side of the court? To us, such a course seems to be dictated by the

whole letter and spirit of the laws of congress upon this subject.

In this way the adjudication of these rights is further removed from the influence of those local prejudices which often, whether justly or not, exist against the Indians.

All the officers of the courts are the appointees of the United States, and by reason of this are supposed to reflect the will of the government in dealing with this much-perplexed question.

Judgment of the court below affirmed.