# PALMORE *v.* UNITED STATES

No. 72–11. Argued February 21, 1973—Decided April 24, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 410.

*Frank F. Flegal* argued the cause and filed briefs for appellant.

*Solicitor General Griswold* argued the cause for the United States. With him on the brief were *Assistant Attorney General Petersen, Deputy Solicitor General Lacovara, Keith A. Jones, Roger A. Pauley,* and *Marshall Tamor Golding.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Aside from an initial question of our appellate jurisdiction under 28 U. S. C. § 1257 (2), this case requires us to decide whether a defendant charged with a felony under the District of Columbia Code may be tried by a judge who does not have protection with respect to tenure and salary under Art. III of the Constitution. We hold that under its Art. I, § 8, cl. 17, power to legislate for the District of Columbia, Congress may provide for trying local criminal cases before judges who, in accordance with the District of Columbia Code, are not accorded life tenure and protection against reduction in salary. In this respect, the position of the District of Columbia defendant is similar to that of the citizen of

any of the 50 States when charged with violation of a state criminal law: Neither has a federal constitutional right to be tried before judges with tenure and salary guarantees.

## I

The facts are uncomplicated. In January 1971, two officers of the District of Columbia Metropolitan Police Department observed a moving automobile with license tags suggesting that it was a rented vehicle. Although no traffic or other violation was then indicated, the officer stopped the vehicle for a spot-check of the driver's license and car-rental agreement. Palmore, the driver of the vehicle, produced a rental agreement from the glove compartment of the car and explained why the car appeared to be, but was not, overdue. During this time, one of the officers observed the hammer mechanism of a gun protruding from under the armrest in the front seat of the vehicle. Palmore was arrested and later charged with the felony of carrying an unregistered pistol in the District of Columbia after having been convicted of a felony, in violation of the District of Columbia Code, § 22–3204 (1967).[1] He was tried and found guilty in the Superior Court of the District of Columbia.

---

[1] The section provided:

"No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in section 22–3215, unless the violation occurs after he has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or in another jurisdiction, in which case he shall be sentenced to imprisonment for not more than ten years."

Under Title I of the District of Columbia Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473 (Reorganization Act),[2] the judges of the Superior

[2] Before passage of the District of Columbia Court Reform and Criminal Procedure Act of 1970, the local court system consisted of one appellate court and three trial courts, two of which, the juvenile court and the tax court, were courts of special jurisdiction. The third trial court, the District of Columbia Court of General Sessions, was one of quite limited jurisdiction, its criminal jurisdiction consisting solely of that exercised concurrently with the United States District Court over misdemeanors and petty offenses, D. C. Code Ann. § 11–963 (1967). The court's civil jurisdiction was restricted to cases where the amount in controversy did not exceed $10,000, and it had jurisdiction over cases involving title to real property only as part of a divorce action. *Id.*, §§ 11–961 and 11–1141. The judgments of the appellate court, the District of Columbia Court of Appeals, were subject to review by the United States Court of Appeals for the District of Columbia Circuit. *Id.*, § 11–321.

The United States District Court for the District had concurrent jurisdiction with the Court of General Sessions over most of the criminal and civil matters handled by that court, *id.*, §§ 11–521, 11–522, and 11–523, and had exclusive jurisdiction over felony offenses, even though committed in violation of locally applicable laws, *id.*, § 11–521. Thus, the District Court was filling the role of both a local and federal court.

Seeking to improve the performance of the court system, Congress, in Title I of the Reorganization Act, invested the local courts with jurisdiction equivalent to that exercised by state courts. S. Rep. No. 91–405, pp. 2–3; H. R. Rep. No. 91–907, pp. 23–24. The three former trial courts were combined into the new Superior Court of the District of Columbia, D. C. Code Ann. § 11–901 (Supp. V, 1972), which was vested, with a minor exception, *id.*, § 11–502 (3), with exclusive jurisdiction over all criminal cases, including felonies, brought under laws applicable exclusively to the District, *id.*, § 11–923 (b). Its civil jurisdiction reached all civil actions and any other matter at law or in equity, brought in the District of Columbia, except those in which exclusive jurisdiction was vested in the United States District Court. *Id.*, § 11–921. The local appeals court, the District of Columbia Court of Appeals, would ultimately not be subject to review by the United States Court of

Court are appointed by the President and serve for terms of 15 years. D. C. Code Ann. §§ 11–1501 (a), 11–1502 (Supp. V, 1972).[3] Palmore moved to dismiss the indictment against him, urging that only a court "ordain[ed] and establish[ed]" in accordance with Art. III of the United States Constitution could constitutionally try him for a felony prosecution under the District of Columbia Code. He also moved to suppress the pistol as the fruit of an illegal search and seizure. The motions were denied in the Superior Court, and Palmore was convicted.

The District of Columbia Court of Appeals affirmed, concluding that under the plenary power to legislate for the District of Columbia, conferred by Art. I, § 8, cl. 17, of the Constitution, Congress had "constitutional power to proscribe certain criminal conduct only in the District and to select the appropriate court, whether it is created by virtue of article III or article I, to hear and determine these particular criminal cases within the District." 290 A. 2d 573, 576–577 (1972). Palmore filed a notice of appeal with the District of

Appeals, id., § 11–301, and was declared to be the "highest court of the District of Columbia" for purposes of further review by this Court. Id., § 11–102.

In addition to the shift in jurisdiction, the number of local judges was increased, their tenure was lengthened from 10 to 15 years, and their salaries were increased and fixed at a percentage of that of judges of the United States courts. Id., §§ 11–702, 11–703, 11–903, 11–904, and 11–1502; D. C. Code Ann. §§ 11–702, 11–902, 11–1502, 47–2402 (1967). The Reorganization Act established a Commission on Judicial Disabilities and Tenure to deal with suspension, retirement, or removal of local judges, D. C. Code Ann. § 11–1521 et seq. (Supp. V, 1972). It also provided for improved administration of the local courts, id., § 11–1701 et seq., including authorization for an Executive Officer responsible for the administration of the local court system. Id., § 11–1703.

[3] The 15-year term is subject to the provision for mandatory retirement at age 70. D. C. Code Ann. § 11–1502. (Supp. V, 1972).

Columbia Court of Appeals and his jurisdictional statement here, purporting to perfect an appeal under 28 U. S. C. § 1257 (2). We postponed further consideration of our jurisdiction to review this case by way of appeal to the hearing on the merits. 409 U. S. 840 (1972).

## II

Title 28 U. S. C. § 1257 [4] specifies the circumstances under which the final judgments of the highest court of a State may be reviewed in this Court by way of appeal or writ of certiorari. As amended in 1970 by § 172 (a)(1) of the Reorganization Act, 84 Stat. 590, the term "highest court of a State" as used in § 1257 includes the District of Columbia Court of Appeals. Appeal lies from such courts only where a statute of the United States is struck down, 28 U. S. C. § 1257 (1), or where a statute of a State is sustained against federal constitutional attack, *id.*, § 1257 (2). Because the statute at

---

[4] Title 28 U. S. C. § 1257 provides:

"Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:

"(1) By appeal, where is drawn in question the validity of a treaty or statute of the United States and the decision is against its validity.

"(2) By appeal, where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity.

"(3) By writ of certiorari, where the validity of a treaty or statute of the United States is drawn in question or where the validity of a State statute is drawn in question on the ground of its being repugnant to the Constitution, treaties or laws of the United States, or where any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties or statutes of, or commission held or authority exercised under, the United States.

"For the purposes of this section, the term 'highest court of a State' includes the District of Columbia Court of Appeals."

issue was upheld in this case, an appeal to this Court from that judgment lies only if the statute was a "statute of any state" within the meaning of § 1257 (2). Palmore insists that it is, but we cannot agree.

The 1970 amendment to § 1257 plainly provided that the District of Columbia Court of Appeals should be treated as the "highest court of a State," but nowhere in § 1257, or elsewhere, has Congress provided that the words "statute of any state," as used in § 1257 (2), are to include the provisions of the District of Columbia Code. A reference to "state statutes" would ordinarily not include provisions of the District of Columbia Code, which was enacted, not by a state legislature, but by Congress, and which applies only within the boundaries of the District of Columbia. The District of Columbia is constitutionally distinct from the States, *Hepburn* v. *Ellzey*, 2 Cranch 445 (1805); cf. *National Mutual Ins. Co.* v. *Tidewater Transfer Co.*, 337 U. S. 582 (1949). Nor does it follow from the decision to treat the District of Columbia Court of Appeals as a state court that the District Code was to be considered a state statute for the purposes of § 1257. We are entitled to assume that in amending § 1257, Congress legislated with care, and that had Congress intended to equate the District Code and state statutes for the purposes of § 1257, it would have said so expressly, and not left the matter to mere implication.[5]

---

[5] An express provision "would have been easy," *Farnsworth* v. *Montana*, 129 U. S. 104, 113 (1889), as demonstrated by specific provisions in the United States Code concerning the District of Columbia. Cf. 28 U. S. C. § 1363, added to the United States Code by § 172 (c) (1) of the Reorganization Act, 84 Stat. 590, where for purposes of c. 85 dealing with the jurisdiction of the United States District Courts, it is provided that "references to laws of the United States or Acts of Congress do not

Jurisdictional statutes are to be construed "with precision and with fidelity to the terms by which Congress has expressed its wishes," *Cheng Fan Kwok* v. *INS,* 392 U. S. 206, 212 (1968); and we are particularly prone to accord "strict construction of statutes authorizing appeals" to this Court. *Fornaris* v. *Ridge Tool Co.,* 400 U. S. 41, 42 n. 1 (1970). We will not, therefore, hold that Congress intended to treat the District of Columbia Code as a state statute for the purposes of § 1257 (2). Cf. *Farnsworth* v. *Montana,* 129 U. S. 104, 112–114 (1889).

Palmore relies on *Balzac* v. *Porto Rico,* 258 U. S. 298 (1922), where an enactment of the territorial legislature of Puerto Rico was held to be a statute of a State within the meaning of the then-applicable statutory provisions governing appeals to this Court. That result has been codified in 28 U. S. C. § 1258; but, even so, the *Balzac* rationale was severely undermined in *Fornaris,* where we held that a statute passed by the legislature of Puerto Rico is not "a State statute" within the meaning of 28 U. S. C. § 1254 (2), and that it should not be treated as such in the absence of more definitive guidance from Congress.

We conclude that we do not have jurisdiction of the appeal filed in this case. Palmore presents federal constitutional issues, however, that are reviewable by writ of certiorari under § 1257 (3); and treating the jurisdictional statement as a petition for writ of certiorari, cf. 28 U. S. C. § 2103, we grant the petition limited to the question of whether Palmore was entitled to be tried by

include laws applicable exclusively to the District of Columbia." See also the treatment of the District of Columbia as a "State" for purposes of diversity jurisdiction, 28 U. S. C. § 1332 (d), and the equally discrete provision of 28 U. S. C. § 1451, added to the Code by § 172 (d)(1) of the Reorganization Act, 84 Stat. 591, which provides that for purposes of the removal provisions, the Superior Court of the District of Columbia is to be considered a "State court"; and the District of Columbia is deemed to be a "State."

a court ordained and established in accordance with Art. III, § 1, of the Constitution.[6] It is to this issue that we now turn.

## III

Art. I, § 8, cl. 17, of the Constitution provides that Congress shall have power "[t]o exercise exclusive Legislation in all Cases whatsoever, over" the District of Columbia. The power is plenary. Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes. Congress "may exercise within the District all legislative powers that the legislature of a State might exercise within the State; and may vest and distribute the judicial authority in and among courts and magistrates, and regulate judicial proceedings before them, as it may think fit, so long as it does not contravene any provision of the Constitution of the United States." *Capital Traction Co.* v. *Hof,* 174 U. S. 1, 5 (1899). This has been the characteristic view in this Court of congressional powers with respect to the District.[7] It is apparent that the power of Congress

---

[6] Because we postponed the question of our jurisdiction over this appeal to consideration of the merits, rather than entering an unrestricted notation of probable jurisdiction, there is no basis for inferring, from our finding this appeal improper, that our initial order must nevertheless be taken as having granted certiorari on any of the issues presented. Hence, our denial of the writ with respect to the Fourth Amendment claim, rather than a dismissal, is proper. Cf. *Mishkin* v. *New York,* 383 U. S. 502, 512–513 (1966).

[7] *Kendall* v. *United States,* 12 Pet. 524, 619 (1838); *Mattingly* v. *District of Columbia,* 97 U. S. 687, 690 (1878); *Gibbons* v. *District of Columbia,* 116 U. S. 404, 407 (1886); *Shoemaker* v. *United States,* 147 U. S. 282, 300 (1893); *Atlantic Cleaners & Dyers* v. *United States,* 286 U. S. 427, 435 (1932); *O'Donoghue* v. *United States,* 289 U. S. 516, 545 (1933).

under Clause 17 permits it to legislate for the District in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it under Art. I, § 8. See *Gibbons* v. *District of Columbia,* 116 U. S. 404, 408 (1886).

Pursuant to its Clause 17 authority, Congress has from time to time enacted laws that compose the District of Columbia Code. The 1970 Reorganization Act amended the Code by creating the Superior Court of the District of Columbia and the District of Columbia Court of Appeals, the courts being expressly "established pursuant to article I of the Constitution." D. C. Code Ann. § 11–101 (2) (Supp. V, 1972). See n. 2, *supra.* The Superior Court, among other things, was vested with jurisdiction to hear criminal cases involving alleged violations of the criminal laws applicable only to the District of Columbia, *id.,* § 11–923; the District of Columbia Court of Appeals, with jurisdiction to hear appeals in such cases. *Id.,* § 11–721. At the same time, Congress exercised its powers under Art. I, § 8, cl. 9, and Art. III to redefine the jurisdiction of the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit. *Id.,* §§ 11–301, 11–501, and 11–502. As the Committee on the District of Columbia said, H. R. Rep. No. 91–907, p. 44:

> "This title makes clear (section 11–101) that the District of Columbia Courts (the District of Columbia Court of Appeals, and the Superior Court of the District of Columbia) are Article I courts, created pursuant to Article I, section 8, clause 17 of the United States Constitution, and not Article III courts. The authority under which the local courts are established has not been statutorily provided in prior law; the Supreme Court of the United States

has not declared the local system to be either Article I or Article III courts, decisions having indicated that the District of Columbia courts are, in this respect, both fish and fowl. This expression of the intent of the Congress clarifies the status of the local courts."

It was under the judicial power conferred on the Superior Court by the 1970 Reorganization Act that Palmore was convicted of violation of § 22–3204 of the District of Columbia Code (1967). The conviction was clearly within the authority granted Congress by Art. I, § 8, cl. 17, unless, as Palmore contends, Art. III of the Constitution requires that prosecutions for District of Columbia felonies must be presided over by a judge having the tenure and salary protections provided by Art. III.[8]

---

[8] Sections 1 and 2 of Art. III state:

"SECTION 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

"SECTION 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

"In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction,

Palmore's argument is straightforward: Art. III vests the "judicial Power" of the United States in courts with judges holding office during good behavior and whose salary cannot be diminished; the "judicial Power" that these courts are to exercise "shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . ."; the District of Columbia Code, having been enacted by Congress, is a law of the United States; this prosecution for violation of § 22–3204 of the Code is therefore a case arising under the laws of the United States, involves an exercise of the "judicial Power" of the United States, and must therefore be tried by an Art. III judge.

This position ultimately rests on the proposition that an Art. III judge must preside over every proceeding in which a charge, claim, or defense is based on an Act of Congress or a law made under its authority. At the very least, it asserts that criminal offenses under the laws passed by Congress may not be prosecuted except in courts established pursuant to Art. III. In our view, however, there is no support for this view in either constitutional text or in constitutional history and practice.

Article III describes the judicial power as extending to all cases, among others, arising under the laws of the United States; but, aside from this Court, the power is vested "in such inferior Courts as the Congress may from time to time ordain and establish." The decision with

---

both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

respect to inferior federal courts, as well as the task of defining their jurisdiction, was left to the discretion of Congress. That body was not constitutionally required to create inferior Art. III courts to hear and decide cases within the judicial power of the United States, including those criminal cases arising under the laws of the United States. Nor, if inferior federal courts were created, was it required to invest them with all the jurisdiction it was authorized to bestow under Art. III. "[T]he judicial power of the United States . . . is (except in enumerated instances, applicable exclusively to this court) dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of Congress, who possess the sole power of creating the tribunals (inferior to the Supreme Court) . . . and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good." *Cary* v. *Curtis*, 3 How. 236, 245 (1845).[9] Congress plainly understood this, for until 1875 Congress refrained from providing the lower federal courts with general federal-question jurisdiction. Until that time, the state courts provided the only forum for vindicating many important federal claims. Even then, with exceptions, the state courts remained the sole forum for the trial of federal cases not involving the required jurisdictional amount, and for the most part retained

---

[9] This was the view of the Court prior to *Martin* v. *Hunter's Lessee*, 1 Wheat. 304 (1816). *Turner* v. *Bank of North America*, 4 Dall. 8 (1799); *United States* v. *Hudson*, 7 Cranch 32 (1812). And the contrary statements in *Hunter's Lessee, supra,* at 327–339, did not survive later cases. See for example, in addition to *Cary* v. *Curtis*, 3 How. 236 (1845), quoted in the text, *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 721–722 (1838); *Sheldon* v. *Sill*, 8 How. 441 (1850); *Case of the Sewing Machine Companies*, 18 Wall. 553, 577–578 (1874); *Kline* v. *Burke Construction Co.*, 260 U. S. 226, 233–234 (1922).

concurrent jurisdiction of federal claims properly within the jurisdiction of the lower federal courts.

It was neither the legislative nor judicial view, therefore, that trial and decision of all federal questions were reserved for Art. III judges. Nor, more particularly, has the enforcement of federal criminal law been deemed the exclusive province of federal Art. III courts. Very early in our history, Congress left the enforcement of selected federal criminal laws to state courts and to state court judges who did not enjoy the protections prescribed for federal judges in Art. III. See Warren, Federal Criminal Laws and the State Courts, 38 Harv. L. Rev. 545, 551–553, 570–572 (1925); F. Frankfurter & J. Landis, The Business of the Supreme Court 293 (1927); Note, Utilization of State Courts to Enforce Federal Penal and Criminal Statutes: Development in Judicial Federalism, 60 Harv. L. Rev. 966 (1947). More recently, this Court unanimously held that Congress could constitutionally require state courts to hear and decide Emergency Price Control Act cases involving the enforcement of federal penal laws; the fact "that Rhode Island has an established policy against enforcement by its courts of statutes of other states and the United States which it deems penal, cannot be accepted as a 'valid excuse.' " *Testa* v. *Katt,* 330 U. S. 386, 392 (1947). Although recognizing the contrary sentiments expressed in *Prigg* v. *Pennsylvania,* 16 Pet. 539, 615–616 (1842), and other cases, the sense of the *Testa* opinion was that it merely reflected longstanding constitutional decision and policy represented by such cases as *Claflin* v. *Houseman,* 93 U. S. 130 (1876), and *Mondou* v. *New York, N. H. & H. R. Co.,* 223 U. S. 1 (1912).

It is also true that throughout our history, Congress has exercised its power under Art. IV to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States" by creating

territorial courts and manning them with judges appointed for a term of years. These courts have not been deemed subject to the strictures of Art. III, even though they characteristically enforced not only the civil and criminal laws of Congress applicable throughout the United States, but also the laws applicable only within the boundaries of the particular territory. Speaking for a unanimous Court in *American Ins. Co. v. Canter,* 1 Pet. 511 (1828), Mr. Chief Justice Marshall held that the territorial courts of Florida, although not Art. III courts, could hear and determine cases governed by the admiralty and maritime law that ordinarily could be heard only by Art. III judges. "[T]he same limitation does not extend to the territories. In legislating for them, Congress exercises the combined powers of the general, and of a state government." *Id.,* at 546. This has been the consistent view of this Court.[10] Territorial courts, therefore, have regularly tried criminal cases arising under the general laws of Congress,[11] as well as those brought under territorial laws.[12]

---

[10] *Clinton* v. *Englebrecht,* 13 Wall. 434, 447 (1872); *Hornbuckle* v. *Toombs,* 18 Wall. 648, 655–656 (1874); *Reynolds* v. *United States,* 98 U. S. 145, 154 (1879); *The City of Panama,* 101 U. S. 453, 460 (1880); *McAllister* v. *United States,* 141 U. S. 174, 180–184 (1891); *United States* v. *McMillan,* 165 U. S. 504, 510 (1897); *Romeu* v. *Todd,* 206 U. S. 358, 369 (1907); *Glidden Co.* v. *Zdanok,* 370 U. S. 530, 544–548 (1962).

[11] See, *e. g., Baker* v. *United States,* 1 Wis. 641 (1846); *United States* v. *Tom,* 1 Ore. 26 (1853); *Franklin* v. *United States,* 1 Colo. 35 (1867); *Pickett* v. *United States,* 1 Idaho 523 (1874); *United States* v. *Reynolds,* 1 Utah 226 (1875); *Fisher* v. *United States,* 1 Okla. 252, 31 P. 195 (1892).

[12] See, *e. g., Territory of Oregon* v. *Coleman,* 1 Ore. 191 (1855); *Gile* v. *People,* 1 Colo. 60 (1867); *People* v. *Waters,* 1 Idaho 560 (1874); *People* v. *Shafer,* 1 Utah 260 (1875); *Ex parte Larkin,* 1 Okla. 53, 25 P. 745 (1891).

There is another context in which criminal cases arising under federal statutes are tried, and defendants convicted, in non-Art. III courts. Under its Art. I, § 8, cl. 14, power "[t]o make Rules for the Government and Regulation of the land and naval Forces," Congress has declared certain behavior by members of the Armed Forces to be criminal and provided for the trial of such cases by court-martial proceedings in the military mode, not by courts ordained and established under Art. III. Within their proper sphere, courts-martial are constitutional instruments to carry out congressional and executive will. *Dynes* v. *Hoover,* 20 How. 65, 79, 82 (1857). The "exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Art. III trials need apply," *O'Callahan* v. *Parker,* 395 U. S. 258, 261 (1969); and "the Constitution does not provide life tenure for those performing judicial functions in military trials," *Toth* v. *Quarles,* 350 U. S. 11, 17 (1955).

"The same confluence of practical considerations that dictated the result in [*American Ins. Co.* v. *Canter, supra*], has governed the decision in later cases sanctioning the creation of other courts with judges of limited tenure," *Glidden Co.* v. *Zdanok,* 370 U. S. 530, 547 (1962), such as the Court of Private Land Claims, *United States* v. *Coe,* 155 U. S. 76, 85–86 (1894); the Choctaw and Chickasaw Citizenship Court, *Stephens* v. *Cherokee Nation,* 174 U. S. 445 (1899); *Ex parte Joins,* 191 U. S. 93 (1903); *Wallace* v. *Adams,* 204 U. S. 415 (1907); courts created in unincorporated districts outside the mainland, *Downes* v. *Bidwell,* 182 U. S. 244, 266–267 (1901); *Balzac* v. *Porto Rico,* 258 U. S., at 312–313, and the Consular Courts established by concessions from foreign countries, *In re Ross,* 140 U. S. 453, 464–465, 480 (1891).

## IV

Whatever may be true in other instances, however, it is strongly argued that *O'Donoghue* v. *United States,* 289 U. S. 516 (1933), constrains us to hold that all of the courts of the District of Columbia must be deemed Art. III courts and that the judges presiding over them must be appointed to serve during their good behavior in accordance with the requirements of Art. III. *O'Donoghue* involved the question whether the judges of the District of Columbia's Supreme Court and Court of Appeals were constitutionally protected from having their salaries reduced by an Act of Congress. This Court, over three dissents and contrary to extensive prior dicta, see *Ex parte Bakelite Corp.,* 279 U. S. 438, 450 (1929); *Butterworth* v. *Hoe,* 112 U. S. 50 (1884); *Keller* v. *Potomac Electric Power Co.,* 261 U. S. 428 (1923); *Federal Radio Comm'n* v. *General Electric Co.,* 281 U. S. 464 (1930), held that the two courts under consideration were constitutional courts exercising the judicial power of the United States and that the judges in question were not subject to the salary reduction legislation as they would have been had they been judges of legislative courts.

We cannot agree that *O'Donoghue* governs this case.[13] The District of Columbia courts there involved, the

---

[13] We should note here that in *Glidden Co.* v. *Zdanok, supra,* it was urged that Art. III forbade the assignment of a judge of the Court of Customs and Patent Appeals to try a criminal case arising under the District of Columbia Code. The Court of Appeals ruled that even if the judge in question was not an Art. III judge, Art. I, § 8, cl. 17, was sufficient authority for his assignment to try cases in the District. The United States there urged that this was true at least with respect to laws arising under the District of Columbia Code rather than under a law of national application. Mr. Justice Harlan, for himself and Justices BRENNAN and STEWART, found it unnecessary to reach this question, but considered it an open one, for he expressly reserved "intimating any view

Supreme Court and the Court of Appeals, had authority not only in the District, but also over all those controversies, civil and criminal, arising under the Constitution and the statutes of the United States and having nationwide application. These courts, as this Court noted in its opinion, were "of equal rank and power with those of other inferior courts of the federal system . . . ." *O'Donoghue, supra,* at 534. Relying heavily on congressional intent, the Court considered that Congress, by consistently providing the judges of these courts with lifetime tenure, had indicated a "congressional practice from the beginning [which] recognize[d] a complete parallelism between the courts of the District [of Columbia] and the district and circuit courts of appeals of the United States." *Id.,* at 549. Moreover, these courts, constituted as they were, and being closer to the legislative department, "exercise a more extensive jurisdiction in cases affecting the operations of the general government and its various departments," *id.,* at 535, and were the only courts within the District in which District inhabitants could exercise their "right to have their cases arising under the Constitution heard and determined by federal courts created under, and vested with the judicial power conferred by, Art. III." *Id.,* at 540.

The case before us is a far cry from *O'Donoghue.* Here Congress has expressly created two systems of courts in the District. One of them is made up of the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Co-

---

as to the correctness of the holding below . . . ." 370 U. S., at 538. Apparently, for him, *O'Donoghue* had not foreclosed the issue with respect to the trial of the criminal case under the District of Columbia Code. Mr. Justice Clark, for himself and the Chief Justice, also thought the question open. See *id.,* at 589 n. 4.

lumbia Circuit, which are constitutional courts manned by Art. III judges to which the citizens of the District must or may resort for consideration of those constitutional and statutory matters of general concern which so moved the Court in *O'Donoghue*. The other system is made up of strictly local courts, the Superior Court and the District of Columbia Court of Appeals. These courts were expressly created pursuant to the plenary Art. I power to legislate for the District of Columbia, D. C. Code Ann. § 11–101 (2) (Supp. V, 1972), and to exercise the "powers of . . . a State government in all cases where legislation is possible." *Stoutenburgh* v. *Hennick*, 129 U. S. 141, 147 (1889).

The *O'Donoghue* Court had before it District of Columbia courts in which the consideration of "purely local affairs [was] obviously subordinate and incidental." *O'Donoghue, supra*, at 539. Here, on the other hand, we have courts the focus of whose work is primarily upon cases arising under the District of Columbia Code and to other matters of strictly local concern. They handle criminal cases only under statutes that are applicable to the District of Columbia alone. *O'Donoghue* did not concern itself with courts like these, and it is not controlling here.

## V

It is apparent that neither this Court nor Congress has read the Constitution as requiring every federal question arising under the federal law, or even every criminal prosecution for violating an Act of Congress, to be tried in an Art. III court before a judge enjoying lifetime tenure and protection against salary reduction. Rather, both Congress and this Court have recognized that state courts are appropriate forums in which federal questions and federal crimes may at times be tried; and that the

requirements of Art. III, which are applicable where laws of national applicability and affairs of national concern are at stake, must in proper circumstances give way to accommodate plenary grants of power to Congress to legislate with respect to specialized areas having particularized needs and warranting distinctive treatment. Here, Congress reorganized the court system in the District of Columbia and established one set of courts in the District with Art. III characteristics and devoted to matters of national concern. It also created a wholly separate court system designed primarily to concern itself with local law and to serve as a local court system for a large metropolitan area.

From its own studies, Congress had concluded that there was a crisis in the judicial system of the District of Columbia, that case loads had become unmanageable, and that neither those matters of national concern nor those of strictly local cognizance were being promptly tried and disposed of by the existing court system. See, e. g., 115 Cong. Rec. 25538 (1969); 116 Cong. Rec. 8091–8092 (1970).[14] The remedy in part, was to relieve the regular Art. III courts, that is, the United States District Court for the District of Columbia and the United States

---

[14] The Senate Committee noted that notwithstanding the visiting judge program, "an unsurpassed number of days on the bench per district court judge," and as many as 12 out of the 14 District Court judges being "assigned full time to the trial of local felony offenses," the backlog of criminal cases in the United States District Court numbered 1,669, and the median time lapse from filing to final disposition in felony trials in that court was more than triple that in other district courts. Additionally, the median time for civil jury trial in the District Court was nearly double that in other district courts. Though there had been an increase in the number of felonies committed in the District of Columbia, there was a concomitant decrease in the number of felonies prosecuted. S. Rep. No. 91–405, supra, at 2–3.

Court of Appeals for the District of Columbia Circuit, from the smothering responsibility for the great mass of litigation, civil and criminal, that inevitably characterizes the court system in a major city and to confine the work of those courts to that which, for the most part, they were designed to do, namely, to try cases arising under the Constitution and the nationally applicable laws of Congress. The other part of the remedy, equally essential, was to establish an entirely new court system with functions essentially similar to those of the local courts found in the 50 States of the Union with responsibility for trying and deciding those distinctively local controversies that arise under local law, including local criminal laws having little, if any, impact beyond the local jurisdiction. S. Rep. No. 91–405, pp. 1–3, 5, 18; H. R. Rep. No. 91–907, pp. 23–24, 33.

Furthermore, Congress, after careful consideration, determined that it preferred, and had the power to utilize, a local court system staffed by judges without lifetime tenure. S. Rep. No. 91–405, *supra*, at 17–18; H. R. Rep. No. 91–907, *supra*, at 44. Congress made a deliberate choice to create judgeships with terms of 15 years, D. C. Code Ann. § 11–1502 (Supp. V, 1972), and to subject judges in those positions to removal or suspension by a judicial commission under certain established circumstances. *Id.*, §§ 11–1502, 11–1521 *et seq.* It was thought that such a system would be more workable and efficient in administering and discharging the work of a multifaceted metropolitan court system. See S. Rep. No. 91–405, *supra*, at 8–11; H. R. Rep. No. 91–907, *supra*, at 35–39.

In providing for fixed terms of office, Congress was cognizant of the fact that "virtually no State has provided" for tenure during good behavior, S. Rep. No. 91–405, *supra*, at 8, see H. R. Rep. No. 91–907, *supra*,

at 38, the District of Columbia Court of Appeals noting that 46 of the 50 States have not provided life tenure for trial judges who hear felony cases, 290 A. 2d, at 578 n. 12; and the provisions of the Act, with respect to court administration and to judicial removal and suspension, were considered by some as a model for the States. 115 Cong. Rec. 25538 (1969). See Hearings on H. R. 13689 and 12854 before Subcommittee No. 1 of the House Committee on the District of Columbia, 91st Cong., 1st Sess., pt. 1, pp. 69, 71 (1969).

We do not discount the importance attached to the tenure and salary provisions of Art. III, but we conclude that Congress was not required to provide an Art. III court for the trial of criminal cases arising under its laws applicable only within the District of Columbia. Palmore's trial in the Superior Court was authorized by Congress' Art. I power to legislate for the District in all cases whatsoever. Palmore was no more disadvantaged and no more entitled to an Art. III judge than any other citizen of any of the 50 States who is tried for a strictly local crime. Nor did his trial by a nontenured judge deprive him of due process of law under the Fifth Amendment any more than the trial of the citizens of the various States for local crimes by judges without protection as to tenure deprives them of due process of law under the Fourteenth Amendment.

The judgment of the District of Columbia Court of Appeals is affirmed.

*So ordered.*

MR. JUSTICE DOUGLAS, dissenting.

Appellant, indicted for carrying a dangerous weapon in violation of D. C. Code Ann. § 22–3204, was tried and convicted in the Superior Court of the District of Co-

lumbia, an Art. I court created by Congress[1] under the District of Columbia Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473. His timely objection is that he was tried, convicted, and sentenced by a court not established under Art. III.

The judges of the court that convicted him

—hold office for a term of fifteen years,[2] not for life as do Art. III judges;

—unlike Art. III judges,[3] their salaries are not protected from diminishment during their continuance in office;

—unlike Art. III judges, they can be removed from office by a five-member Commission[4] through

---

[1] D. C. Code Ann. § 11–101 (Supp. V, 1972) provides, "The judicial power in the District of Columbia is vested in . . . (2) The following District of Columbia courts established pursuant to article I of the Constitution: (A) The District of Columbia Court of Appeals. (B) The Superior Court of the District of Columbia."

[2] D. C. Code Ann. § 11–1502 (Supp. V, 1972).

[3] By Art. III, § 1, federal judges "hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."

[4] A Commission on Judicial Disabilities and Tenure is established with the power "to suspend, retire, or remove" one of these judges. D. C. Code Ann. § 11–1521 (Supp. V, 1972). The President names three members, the Commissioner of the District names one, and the Chief Judge of the District Court names the fifth. There are three alternate members. The President names the Chairman. *Id.*, § 11–1522. All members are appointed for a term of six years. *Id.*, § 11–1523. A judge must be removed if he has committed a felony and been finally convicted. *Id.*, § 11–1526 (a) (1). He shall be removed if the Commission finds

"(A) willful misconduct in office,

"(B) willful and persistent failure to perform judicial duties, or

"(C) any other conduct which is prejudicial to the administration of justice or which brings the judicial office into disrepute." *Ibid.*

He shall be involuntarily retired if "(1) the Commission deter-

less formidable means of procedure than impeachment. While two of the five members must be lawyers (one a member of the District Bar in active practice for at least five of the ten years prior to his appointment and one an active or retired federal judge serving in the District) the other three may be laymen. One of the three must be a layman. D. C. Code Ann. § 11–1522 (Supp. V, 1972).

In other words, these Superior Court judges are not members of the independent judiciary which has been one of our proudest boasts, by reason of Art. III. The safeguards accorded Art. III judges were designed to protect litigants with unpopular or minority causes or litigants who belong to despised or suspect classes. The safeguards surround the judge and give him a measure of protection against the hostile press, the leftist or rightist demands of the party in power, the glowering looks of those in the top echelon in whose hands rest the power of reappointment.

In the Constitutional Convention of 1787 it was proposed that judges "may be removed by the Executive on the application by the Senate and House of Represent-

---

mines that the judge suffers from a mental or physical disability (including habitual intemperance) which is or is likely to become permanent and which prevents, or seriously interferes with, the proper performance of his judicial duties, and (2) the Commission files in the District of Columbia Court of Appeals an order of involuntary retirement and the order is affirmed on appeal or the time within which an appeal may be taken from the order has expired." *Id.,* § 11–1526 (b).

The Act also contains elaborate provisions for the suspension of the judge without salary, or with retirement salary, or with salary dependent on the circumstances described in §§ 11–1526 (c)(1), (2), and (3). The Act contains the procedure which the Commission must follow and the notice and hearing to which the judge is entitled. *Id.,* § 11–1527.

atives." The proposal was defeated, only Connecticut voting for it. Wilson apparently expressed the common sentiment: "The Judges would be in a bad situation if made to depend on any gust of faction which might prevail in the two branches of our Government." [5]

Without the independence granted and enjoyed by Art. III judges, a federal judge could more easily become the tool of a ravenous Executive Branch. This idea was reflected in Reports by Congress in 1965 and 1966,[6] sponsoring a law that would give lifetime tenure to federal judges in Puerto Rico. The House Report stated: [7]

"... Federal litigants in Puerto Rico should not be denied the benefit of judges made independent by life tenure from the pressures of those who might influence his chances of reappointment, which benefits the Constitution guarantees to the litigants in all other Federal courts."

Art. I, § 8, cl. 17, of the Constitution provides: "The Congress shall have Power . . . To exercise exclusive Legislation . . . over such District . . . as may . . . become the Seat of the Government of the United States . . . ." This legislative power is plenary, giving Congress authority to establish the method by which the District of Columbia will be governed, and to alter from time to time the form of that government. *District of Columbia* v. *Thompson Co.*, 346 U. S. 100, 104–110.

Legislative courts may be given executive and administrative duties, the examples being well known. But if they are given "judicial Power," as are the judges of the

---

[5] Madison, 2 Journal of the Federal Convention 257 (G. Hunt ed. 1908).

[6] H. R. Rep. No. 135, 89th Cong., 1st Sess.; S. Rep. No. 1504, 89th Cong., 2d Sess.

[7] H. R. Rep. No. 135, *supra*, n. 6, at 2.

present Superior Court of the District, those trials have guarantees that are prescribed by the Constitution and Bill of Rights.   First, as to jury trial, Art. III says: "The Trial of all Crimes . . . shall be by Jury."   But trial by jury is also guaranteed by the Sixth Amendment in all criminal prosecutions.   Even Mr. Justice McReynolds and Mr. Justice Butler, not known as libertarians, thought "all" meant "all," not permitting the exclusions of so-called "petty" offenses.   *District of Columbia* v. *Clawans*, 300 U. S. 617, 633.   Congress may not deprive an accused of that protection in a District of Columbia trial. *District of Columbia* v. *Colts*, 282 U. S. 63, 74; *Callan* v. *Wilson*, 127 U. S. 540.

The Fifth Amendment provides for the right to indictment; and Congress may not dispense with that right for a local criminal offense in the District of Columbia. *United States* v. *Moreland*, 258 U. S. 433.

The Sixth Amendment's guarantee extends to speedy and public trials, the right of confrontation, compulsory process and the assistance of counsel "[i]n all criminal prosecutions."

The Fifth Amendment guarantees one against double jeopardy and gives the privilege against self-incrimination "in any criminal case," and guarantees that no one shall "be deprived of life, liberty, or property, without due process of law."

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures . . . ."

The Eighth Amendment says that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Few, if any, of these guarantees, I assume, would be applicable to Art. I tribunals exercising legislative or

administrative functions. But are any of them inapplicable in criminal prosecutions where the "judicial Power" of the United States is exercised?

I have been unable to see how that is possible. Yet if those aspects of "judicial Power," as the term is used in Art. III, are all applicable, how can the requirements for an independent judiciary be made an exception? For it is as clearly required by Art. III for any exercise of "judicial Power" as are the other guarantees.

The legislative history of the District of Columbia Court Reform and Criminal Procedure Act of 1970 makes abundantly clear that one main purpose was the creation of some political leverage over Superior Court judges. As the Senate Report states:

> "In drafting the tenure provision of the amended bill, the committee was conscious both of the inexactness of the art of judicial selection and of the importance of tenure in attracting the most competent men to the bench. The committee recognized that the constitutional requirement of 'good behavior' tenure has played a significant role in the historic high quality of the Federal bench. On the other hand, the committee was aware that virtually no State has provided such tenure for its judges, an apparent recognition that the opportunity to review the quality of a judge's performance also has its obvious advantages. The committee, therefore, sought a tenure provision that would combine the attractiveness of the federal system with the opportunity for some review of the judge's work.
>
> .     .     .     .     .
>
> "At present, the only means available to rid the local bench of a sick or venal judge is through the process of impeachment by the House of Repre-

sentatives and trial by the U. S. Senate. To believe that the Congress at this time in our history has the time to police the local judiciary through the impeachment process is just not realistic. That process has not even proven viable when the conduct of Federal, good-behavior tenure judges is drawn into question." S. Rep. No. 91–405, pp. 8, 11.

In *O'Donoghue* v. *United States,* 289 U. S. 516, the Court held unconstitutional an Act of Congress reducing the salaries of trial and appellate judges in the District of Columbia. It held that inherent in the separation of powers was the idea that "the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments." *Id.,* at 530. Since the District was formed of portions of two of the original States, the Court concluded it was "not reasonable to assume that the cession stripped them of these [rights, guarantees, and immunities of the Constitution], and that it was intended that at the very seat of the national government the people should be less fortified by the guaranty of an independent judiciary than in other parts of the Union." *Id.,* at 540. The Court concluded that while Congress could not confer administrative or legislative functions on Art. III courts, it could grant such functions to District courts by reason of Art. I. *Id.,* at 546. But that power, it held, may not be used "to destroy the operative effect of the judicial clause within the District." *Ibid.* The present Act does precisely that. Hence today we make a major retreat from *O'Donoghue.*

Much is made of the fact that many States (about three-fourths of them) have their judges at all levels elected by the people. That was one of the basic Jacksonian principles. But the principle governing federal

judges is strongly opposed.[8] Hamilton stated the proposition in No. 79 of the Federalist (J. Cooke ed. 1961):

> "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. The remark made in relation to the president, is equally applicable here. In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* And we can never hope to see realised in practice the complete separation of the judicial from the legislative power, in any system, which leaves the former dependent for pecuniary resources on the occasional grants of the latter. The enlightened friends to good government, in every state, have seen cause to lament the want of precise and explicit precautions in the state constitutions on this head. Some of these indeed have declared that *permanent* salaries should be established for the judges; but the experiment has in some instances

[8] See Brown, The Rent in Our Judicial Armor, 10 Geo. Wash. L. Rev. 127 (1941); Hyde, Judges: Their Selection and Tenure, 22 N. Y. U. L. Q. Rev. 389 (1947); E. Haynes, Selection and Tenure of Judges (1944); Kurland, The Constitution and the Tenure of Federal Judges: Some Notes from History, 36 U. Chi. L. Rev. 665 (1969).

James Bryce, writing in 1888, said: "Any one of the three phenomena I have described—popular elections, short terms, and small salaries—would be sufficient to lower the character of the judiciary. Popular elections throw the choice into the hands of political parties, that is to say, of knots of wirepullers inclined to use every office as a means of rewarding political services, and garrisoning with grateful partisans posts which may conceivably become of political importance. Short terms . . . oblige the judge to remember and keep on good terms with those who have made him what he is, and in whose hands his fortunes lie. They induce timidity, they discourage independence." 1 American Commonwealth, c. 42, p. 507 (3d ed. 1905).

shewn that such expressions are not sufficiently definite to preclude legislative evasions. Something still more positive and unequivocal has been evinced to be requisite. The plan of the convention accordingly has provided, that the judges of the United States 'shall at *stated times* receive for their services a compensation, which shall not be *diminished* during their continuance in office.'

"This, all circumstances considered, is the most eligible provision that could have been devised. It will readily be understood, that the fluctuations in the value of money, and in the state of society, rendered a fixed rate of compensation in the constitution inadmissible. What might be extravagant to day, might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances; yet under such restrictions as to put it out of the power of that body to change the condition of the individual for the worse. A man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation. The clause which has been quoted combines both advantages. The salaries of judicial offices may from time to time be altered, as occasion shall require, yet so as never to lessen the allowance with which any particular judge comes into office, in respect to him."

That theory is opposed to the Jacksonian philosophy concerning election of state judges. But the present statutory scheme for control over Superior Court judges is even opposed to the Jacksonian theory. In the District of Columbia the people do not elect these Art. I

judges. Nor do they "recall" them as is done in some States. The Superior Court judges are named by the President and confirmed by the Senate and they are removable by a commission appointed by the President. The Superior Court judge has no opportunity to put his problems, his conduct, his behavior on the bench to the people. The gun of the commission is held at his head. All of the normal vices of a dependent, removable judiciary are accentuated in the District of Columbia.

The matter of "law and order" naturally assumes in the minds of a majority of the people in the District an acute and special problem. A minority, however, sits as overlord, causing tensions to mount. The case of Harry Alexander, a judge on the Superior Court, has become prominent. Great pressures have been put on him to conform—or else. The problem goes not only to the viability of life in the District but to the vitality of the guarantees in Art. III and in the Bill of Rights. Those guarantees run to every "person"; and the judges on the Art. III courts who sit in the District dispense justice evenly and never undertake to ration it. But some judges, like the Bill of Rights, are in the minds of some a threat to our security.

They, however, insure our security by administering justice evenhandedly. The ideals of Art. III and the Bill of Rights provide the mucilage which holds majorities and minorities together in the federal segment of our Nation, and make tolerable the existence of nonconformists who do not walk to the measure of the beat of the Chief Drummer.

We take a great step backward today when we deprive our federal regime in the District of that judicial independence which helps insure fearless and evenhanded dispensation of justice. No federal court exercising Art. III judicial power should be made a minion of any cabal that from accidents of politics comes into the ascendancy

as an overlord of the District of Columbia. That effort unhappily succeeds today and is in disregard of one of our most cherished constitutional provisions.

As Mr. Justice Black and I put it in our dissent in *Glidden Co.* v. *Zdanok,* 370 U. S. 530, 589, 598, the essential problem in dealing with a "judicial" function exercised by an Art. I court concerns the standards and procedures employed. If the power exercised is "judicial power" defined in Art. III, as was true in the present case, then the standards and procedures must conform to Art. III, one of which is an independent judiciary.

There have been many proposals in our history that are kin to those approved today; and the important ones are reviewed by Prof. Kurland.[9] To date efforts to tamper with the federal judiciary have not been successful, unless it be the bizarre decision of this Court in *Chandler* v. *Judicial Council,* 382 U. S. 1003, 1004, in which Mr. Justice Black and I dissented. The States, of course, have mostly gone the other way.[10] But as Prof. Kurland observed:[11]

> "[T]he various devices that the States have recently adopted for policing their judiciaries are little more than polite blackmail, suggestions that the bar is unhappy with the judge's behavior and he'd better shape up or else. I shudder to think how [easily] the federal courts might have been deprived of the

---

[9] Kurland, *supra,* n. 8.

[10] The California system is discussed by Jack E. Frankel, Executive Secretary of the California Commission On Judicial Qualifications, in Removal of Judges: California Tackles an Old Problem, 49 A. B. A. J. 166 (1963). Mr. Frankel was quoted with approval in the Senate Report proposing the District of Columbia Court Reform and Criminal Procedure Act of 1970. S. Rep. No. 91–405, p. 11.

[11] Kurland, *supra,* n. 8, at 668.

services of Judge Learned Hand under such a system as California's. For politeness to counsel and a willingness to tolerate fools gladly were not among his virtues, and it is only such virtues and that of regular attendance at the court house that the policing systems seem capable of evoking from timid judges."

The way to achieve what is done today is by constitutional amendment. President Andrew Johnson in 1868 said: [12]

"It is strongly impressed on my mind that the tenure of office by the judiciary of the United States during good behavior for life is incompatible with the spirit of republican government, and in this opinion I am fully sustained by the evidence of popular judgment upon this subject in the different States of the Union.

"I therefore deem it my duty to recommend an amendment to the Constitution by which the terms of the judicial officers would be limited to a period of years, and I herewith present it in the hope that Congress will submit it to the people for their decision."

Manipulated judiciaries are common across the world, especially in communist and fascist nations. The faith in freedom which we profess and which is opposed to those ideologies assumes today an ominous cast. It is ominous because it indirectly associates the causes of crime with the Bill of Rights rather than with the sociological factors of poverty caused by unemployment and disemployment, the abrasive political tactics used

---

[12] 8 Messages and Papers of the Presidents 3841 (J. Richardson ed. 1897).

against minorities, the blight of narcotics and the like. Those who hold the gun at the heads of Superior Court judges can retaliate against those who respect the spirit of the Fourth Amendment and the Fifth Amendment and who stand firmly against the ancient practice of using the third degree to get confessions and who fervently believe that the end does not justify the means.

I would reverse the judgment below.