Emma LEE, Robert Harlan, and Vanessa Hayes, Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF APPEALS AND REVIEW, Respondent,

BGM Associates, Intervenor.

No. 79–199.

District of Columbia Court of Appeals.

Argued Feb. 19, 1980.

Decided Nov. 6, 1980.

Paul D. Scott, Neighborhood Legal Services Program, Washington, D. C., for petitioners.

Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., entered an appearance for respondent.

Philip Musolino argued for intervenor. Joanne Sgro, Washington, D. C., was on the brief for intervenor. J. Jonathan Schraub, Washington, D. C., also entered an appearance for intervenor.

Before NEBEKER, HARRIS and FERREN, Associate Judges.

HARRIS, Associate Judge:

Petitioners challenge a decision of the Board of Appeals and Review which granted intervenor BGM Associates (BGM) a variance excusing BGM from compliance with certain emergency directives to correct Housing Code violations. We find that petitioners lack standing, and therefore dismiss the petition for review.

I

This appeal is but one step in a long dispute involving a few tenants' efforts to resist their landlord's attempts to evict them. BGM, the landlord, owns the Garfield Hills Apartments, a complex consisting of 104 rental units. On March 15, 1978, all tenants were sent a "Notice to Vacate." Each tenant was informed that the owner intended to "recover possession of your rental unit for the immediate purpose of discontinuing the housing use and occupancy of such rental unit for a continuous period of not less than six months." *See* D.C.Code 1978 Supp., § 45–1653(b)(6). The notice stated that the tenants had a maximum of 90 days within which to relinquish possession of their apartments. *See id.*, § 45–1653(c)(1). The owner apparently sought to evict the tenants so that the central heating system (which consists of underground pipes running from a common plant to each of the ten buildings in the complex) could be replaced. The owner had been advised early in 1978 that the heating system no longer could be repaired, and that it was advisable for the entire complex to be vacated before a new system was installed.

Subsequently, all of the rental units at Garfield Hills were vacated except the two apartments occupied by petitioners. (Those two apartments are located in different buildings on different streets, compounding the landlord's problems.) Petitioners have opposed and continue to contest BGM's eviction efforts.[1] As the other apartments were vacated, they were boarded up by the landlord; nevertheless, they were subjected to extensive vandalism. Most of the windows in the complex were smashed and many radiators, stoves, toilets, and sinks were broken or removed. As a result, both the water and the gas delivery systems suffered heavy damage. On December 9, 1978, Washington Gas Light Company shut

1. The record on appeal does not disclose the current status of petitioners' attempts to resist eviction. It is clear that the Rental Accommodations Office (RAO) issued an order on April 24, 1978, restraining BGM from filing an action for possession based on the March 15 Notice to Vacate; apparently the RAO found some technical flaw in BGM's Notice to Vacate. It also appears that BGM thereafter sought collateral relief from the RAO order in the Superior Court, rather than pursuing its administrative remedies through the Rental Accommodations Commission. The outcome (or, alternatively, the current status) of the court action is unclear. There is, however, an averment in an advisory memorandum prepared by the Corporation Counsel for the Department of Housing and Community Development indicating that petitioners "were permitted by the Superior Court to continue occupancy notwithstanding landlord eviction notices." Assuming these facts to be true, we remain in the dark as to whether BGM has issued new notices to vacate which do comply with the statutory requirements, or whether petitioners' evictions are otherwise imminent.

off the gas supply to the entire apartment complex. The water supply was turned off on December 12.[2]

Petitioners–the only tenants remaining in the Garfield Hills Apartments–immediately initiated an inspection by the Department of Housing and Community Development (DHCD). Upon inspecting the premises, the DHCD determined that BGM was in violation of § 2405 of the Housing Code because of its failure to provide water and gas (for cooking) in quantities needed for normal occupancy.[3] The DHCD accordingly issued emergency orders directing the landlord to restore both water service and gas for cooking within 24 hours to the two apartments in question.[4]

BGM promptly applied to the DHCD for a variance excusing the landlord from compliance with the emergency orders. BGM argued that compliance would be mechanically and financially impracticable within the meaning of § 2702 of the Housing Code.[5] The DHCD refused to process the variance application, however, on the ground that it could not locate certificates of occupancy in BGM's name covering the premises in question.[6]

BGM then appealed to the Board of Appeals and Review (Board).[7] The landlord alleged error in the DHCD's refusal to process the variance request, and asserted that the 24-hour housing orders were per se unreasonable under § 2701.4 of the Housing Code.[8] The Board held a hearing on De-

2. The hot water system for the complex apparently had not been functional for several months prior to the cutoff of all water, due to the deterioration of the water heater. The entire water supply was terminated on December 12 in order to prevent pipes from freezing and bursting in the vacant apartments.

3. *See* Housing Regulations of the District of Columbia, 5G DCRR § 2405.

4. *See id.*, § 2701. The DHCD orders covered only running water and gas for cooking. They did not include heating fuel, presumably because the DHCD already had taken steps to restore heat to the two apartments on a makeshift basis pursuant to D.C.Code 1973, § 5-313. That section authorizes the government to effect the correction of Housing Code violations whenever a landlord fails or refuses to do so upon proper notice. It also permits the government to assess the cost of correcting such defects against the property owner through a tax lien on the property.

5. That section (5G DCRR § 2702) provides in part:

> Any owner, licensee, or operator required to perform an act by this Code may be excused by the Director or Deputy Director of [the Department of Housing and Community Development] or by the Board of Appeals and Review from the performance of such act, either in whole or in part, upon a finding by such Director or Deputy Director or by such Board of Appeals and Review that the full performance of such act would result in exceptional or undue hardship by reason of excessive structural or mechanical difficulty or impracticability of bringing the premises affected into full compliance with the requirements of this Code; *Provided*, that a variance may be granted only where, and to the extent, necessary to ameliorate such exceptional or undue hardship and only when

> compensating factors are present which give adequate protection to the public health, welfare, safety, or morals, and such variance can be granted without impairing the intent and purposes of the housing program of the District of Columbia as embodied in this Code. Such owner, licensee, or operator may submit, on his own initiative, a written request for a variance setting forth the nature of the act required to be performed, the exceptional or undue hardship which would result from its performance, and any variance from the terms of the notice and requirements of this Code which he may seek. * * *

6. Although the Housing Code requires all rental apartment owners to have certificates of occupancy covering their properties, § 2702 of the Code (*see* note 5, *supra*) permits any "owner, licensee, or operator required to perform an act by this Code" to apply for a variance. Furthermore, the Code broadly defines "owner" to include the true owner of a rental property or his agent. *See id.*, § 1102. The emergency housing orders in this case were issued to "M & J Joint Ventures," which petitioners have described as the property management agent for Garfield Hills. The record does not make it clear in what way M & J Joint Venture is related to BGM Associates, but we note that both entities have the same mailing address. In any case, the record and pleadings leave no doubt that BGM meets the statutory requirements to apply for a variance.

7. *See* Housing Regulations of the District of Columbia, 5G DCRR § 2703.

8. Section 2701.4 provides that notices ordering a landlord to cure a Housing Code violation shall "[a]llow a reasonable time for the performance of any act such notice requires." *See Black v. District of Columbia*, D.C.App., 412 A.2d 1200 (1980).

cember 19 at which the DHCD (through the Corporation Counsel) and BGM were represented. Petitioners did not seek to intervene at that time, nor did either of the parties request the tenants' participation. On December 29, the Board issued a decision reversing the DHCD and granting BGM's application for a variance. The Board's decision, as modified on January 26, 1979, stated in part:

## FINDINGS OF FACT

\*　　\*　　\*　　\*　　\*　　\*

The landlord appeals the 24 hour housing notices under Section 2701.4 (reasonable time for performance) and for a variance (Sections 2702, 2703, and 1102 of the Housing Code). Appellant claims that to comply with the housing order would require excessive structural work and compensating factors exist which merit a variance.

Evidence adduced at the hearing disclosed that the gas in the premises involved had been cut off by the Gas Company. Appellants were advised by the Gas Company that it would be impossible to turn on the gas for the two units involved without turning on the gas for the entire building and that to do so would create a dangerous and hazardous condition. According to an affidavit of William A. Folger, Registered plumber for the District of Columbia, the system has been "vandalized, pumps and other components have been broken or taken away and oil has gotten into the water line throughout the system, causing extensive clogging and damage in the pipes. The apartments have been extensively vandalized, most of the windows in the complex have been smashed and many radiators (together with stoves, toilets and sinks), have been broken or taken out". Mr. Folger further estimated that it would take two to three months to perform minimal repairs necessary to put the gas system into operating condition. The evidence further showed that the domestic water system is likewise inoper-

able. To restore water to the building would in all probability cause the pipes throughout the buildings to freeze and burst and would present a serious danger to the lives and safety of the occupants of the two units involved. Mr. Folger confirmed the opinion of the Washington Gas Light Company that to turn on the gas in the building would create a serious hazard to the occupants and expose them to a possible explosion.

The evidence disclosed that the appellant has offered each tenant in consideration for their moving from the property $2,500.00 in cash, payment of relocation expenses under the Rental Housing Act of 1977, forgiveness of all back rent and two months free rent in comparable housing accommodations which appellant owns and would make available to the tenants.

The Board finds that, without passing on the legal sufficiency of the notices, the tenants in Apt. 301, 2323 Hartford Street, S.E., and Apt. 1, 2328 Irving Street, S.E. were served .with a notice to vacate March 15th, 1978 for the stated reason that the landlord intended to discontinue the housing use and occupancy thereof for a continuous period of six months or more. The notices allowed the tenants 90 days to vacate the property.

## CONCLUSION OF LAW

The Board concludes that the housing units are at the present time unfit for human habitation and that it would be impossible for the landlord to restore gas and water to the two occupied units within the time frame of the orders in these cases. Under the present conditions it is illegal for the landlord to rent the units and for the tenants to occupy the units. Whether the tenants have been legally or illegally evicted is not a matter for consideration of this Board but is properly the subject of consideration by the Landlord and Tenant branch of the Superior Court of the District of Columbia, where the matter is now pending . . . .

## DECISION

The action of the department is reversed by unanimous vote of this Board.

The DHCD thereafter filed a Petition for Reconsideration. Petitioners then sought for the first time to intervene in the proceeding; they filed a motion for leave to intervene along with a motion for reconsideration of the Board's decision.[9] BGM opposed both the DHCD's and petitioners' motions. The Board subsequently denied petitioners' motion for leave to intervene and dismissed their request for reconsideration. In response to the DHCD's petition for reconsideration, the Board made minor technical modifications to its original decision (which are reflected in the excerpt quoted above), but allowed it to stand in all other respects.[10]

The tenants then filed the petition for review which is now before us. BGM intervened to support the Board's decision. The Office of the Corporation Counsel, finding itself in the position of having to defend a Board decision which was contrary to the position which had been taken by the Corporation Counsel on behalf of the DHCD before the Board, declined to participate in this appeal.[11] Thus the conduct of this appeal was left in the hands of petitioners, who were not parties below, and of BGM, which intervened.

Petitioners argue that (1) the Board abused its discretion in denying their motion to intervene; (2) BGM lacked standing to seek a variance from the emergency notices of Housing Code violations, and, therefore, the Board had no jurisdiction to consider the merits of the appeal to it; and (3) the Board's finding as to the unreasonableness of the 24-hour notice is not supported by substantial evidence in the record. We do not reach these issues, because we conclude that petitioners lack standing.

## II

Neither petitioners nor BGM briefed or argued the question of standing before us. Nevertheless, our jurisdiction is limited to that which Congress has bestowed upon us (pursuant to its Article I power to "constitute Tribunals inferior to the Supreme Court"). *See District of Columbia v. Walters*, D.C.App., 319 A.2d 332, 338 n.13, *appeal dismissed, cert. denied*, 419 U.S. 1065, 95 S.Ct. 650, 42 L.Ed.2d 661 (1974). Congress has limited our authority to review local administrative actions; under the District of Columbia Administrative Procedure Act (DCAPA), we may entertain only petitions brought by "[a]ny person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case . . . ." D.C.Code 1978 Supp., § 1–1510. Because Congress has so restricted the class of persons who may appeal an administrative decision to this court, our jurisdiction over the subject matter on review is contingent upon petitioners' right to prosecute this appeal. Therefore, we feel obliged to raise the issue of petitioners' standing sua sponte. *See*

---

**9.** Petitioners sought to intervene pursuant to the Rules of Practice and Procedure before the Board of Appeals and Review, 10 DCRR § 43.5. That section provides in relevant part that "the Board . . . may in its discretion and for good cause shown, permit interested persons to intervene in the appeal for such general or limited purpose as the Board . . . may specify."

**10.** Meanwhile, following the Board's initial decision reversing the DHCD, petitioners had gone to the Superior Court in an attempt to obtain a temporary restraining order or a preliminary injunction compelling the landlord to restore running water and cooking gas to their two apartments. After a hearing, the trial judge made findings consistent with those made earlier by the Board and denied petitioners' request for an injunction. (Civil Nos. L&T

75914–'78, L&T 75908–'78, Jan. 3, 1979). Petitioners then brought an emergency appeal to this court; we summarily affirmed the trial court by an unpublished order. (D.C.App., No. 79-9, Jan. 6, 1979).

**11.** In a letter to the Clerk of this court, Leo N. Gorman, Assistant Corporation Counsel, explained:

The decision of this Office not to file a brief was based on (1) the conflict between the factual position this office presented to the Board and the factual position adopted by the Board in its ruling, and (2) the circumstance that there would be contending parties before the Court notwithstanding the nonparticipation of this Office.

*United States v. Storer Broadcasting Co.,* 351 U.S. 192, 197, 76 S.Ct. 763, 767, 100 L.Ed. 1081 (1956) ("Jurisdiction depends upon standing to seek review," and such questions may be raised by the court.)

■ The legislative history of the DCAPA indicates that, although there are slight differences in language between the federal APA's standing provision (5 U.S.C. § 702) and its D.C. counterpart, the two provisions were intended to be interpreted virtually identically. *See Basiliko v. District of Columbia,* D.C.App., 283 A.2d 816, 818 (1971), *citing* S.Rep.No.1581, 90th Cong., 2d Sess. 12 (1968) and H.R.Rep.No.202, 90th Cong., 1st Sess. 6 (1967). Thus, as we noted in *Basiliko, supra,* it is appropriate for us to seek guidance from federal court interpretations of the APA's standing requirements.

In *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 22 L.Ed.2d 184 (1970), the Supreme Court held that in order to seek review of an administrative agency's decision, (1) the petitioner must allege that the challenged action has caused him injury in fact, *id.,* at 152, 90 S.Ct. at 829; (2) the interest sought to be protected by the petitioner must be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question, *id.,* at 153, 90 S.Ct. at 829; and (3) there must be no clear legislative intent to withhold judicial review either from the class of persons or in the type of case in-

volved. *Id.,* at 156, 90 S.Ct. at 831.[12] This three-tiered test has been applied consistently by the federal courts, including the United States Court of Appeals for the District of Columbia Circuit. *See, e. g., Gifford-Hill & Co., Inc. v. F. T. C.,* 173 U.S.App.D.C. 135, 136, 523 F.2d 730, 731 (1975); *Ballerina Pen Co. v. Kunzig,* 140 U.S.App.D.C. 98, 101, 433 F.2d 1204, 1207 (1970), *cert. denied sub nom. National Industries for the Blind v. Ballerina Pen Co.,* 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971). In *Basiliko v. District of Columbia, supra,* at 818, we specifically adopted this standard, and we have followed it ever since. *See, e. g., Apartment and Office Building Ass'n of Metropolitan Washington v. Washington,* D.C.App., 343 A.2d 323, 331 (1975); *Board of Elections v. Democratic Central Committee,* D.C.App., 300 A.2d 725, 726 (1973).

■ Petitioners arguably satisfy the second and third requirements for standing. Their interests in the provision of water and gas for cooking apparently fall within the zone of interests which the Housing Code was designed to protect. Furthermore, the legislature has not precluded judicial review of Housing Code appeals decided by the Board of Appeals and Review, nor has it expressly withheld review from persons such as petitioners (*i. e.,* tenants). We find, however, that petitioners have failed to allege any concrete injury in fact as a result of the Board's decision.[13]

---

**12.** The Supreme Court has since added a fourth element to the test for standing: The petitioner must show a substantial probability that the requested relief would alleviate his asserted injury. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 42–46, 96 S.Ct. 1917, 1926–1928, 48 L.Ed.2d 450 (1976). Although we think that this is a wise rule of judicial administration, we need not discuss its applicability to the facts before us since we find that petitioners fail to satisfy the injury in fact criterion.

**13.** The injury in fact requirement originally evolved as a mechanism to enforce the mandate of Article III of the Constitution that federal courts have jurisdiction only in "cases" and "controversies." *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d

343 (1975); *Public Citizen v. Lockheed Aircraft Corp.,* 184 U.S.App.D.C. 133, 139, 565 F.2d 708, 714 (1977). This court, of course, is not bound by the mandates of Article III, since it was created by Congress as an Article I court. *See* D.C.Code 1973, § 11–102(2)(A); *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). In creating this court, however, Congress provided that we, like the federal courts, should hear only "[c]ases and controversies." D.C.Code 1973, § 11–705(b); *see United States v. Cummings,* D.C.App., 301 A.2d 229, 231 (1973). Therefore, the injury in fact requirement is a logical and appropriate component in the test for standing before this court. *Cf. District of Columbia v. Walters,* D.C.App., *supra,* at 338 n.13 (the court, without citing D.C.Code 1973, § 11 -705(b), nevertheless

Although an injury in fact need not be a particularly substantial one to support our jurisdiction over a petition for review, the injury must be one which petitioners have suffered or are in immediate danger of sustaining. *District of Columbia v. Walters, supra,* at 338, *citing Laird v. Tatum,* 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154, *reh. denied,* 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 165 (1972); *see Public Citizen v. Lockheed Aircraft Corp.,* 184 U.S. App.D.C. 133, 139–40, 565 F.2d 708, 714–15 (1977). Petitioners must allege an injury or aggrievement which is real, perceptible, concrete, specific and immediate, rather than one that is conjectural, hypothetical or speculative. *Public Citizen v. Lockheed Aircraft Corp., supra,* at 140, 565 F.2d at 715, *citing United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973), *California Bankers Association v. Shultz,* 416 U.S. 21, 69 (1974), and *Golden v. Zwickler,* 394 U.S. 103, 108–10, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969).

There is nothing in petitioners' briefs or in the record of this case to indicate that petitioners have suffered, or are in immediate danger of suffering, any direct harm as a result of the Board's decision. To the contrary, these sources reveal that the essential services (cooking gas and water) over which this action ostensibly is being contested were restored by the city shortly after the Board hearing, and continue to be provided by the city pursuant to D.C.Code 1973, § 5–313. That section provides:

> Whenever the owner of any real property in the District of Columbia shall fail or refuse, after the service of reasonable notice in the manner provided in section 5–315 to correct any condition which exists on or has arisen from such property in violation of law or of any regulation made by authority of law, with the correction of which condition said owner is by law or by said regulation chargeable, or to show cause, sufficient in the judgment of the Commissioner of said District, why he should not be required to correct such condition, then, and in that instance, the [Mayor] of the District of Columbia may, and he is authorized to, cause such condition to be corrected; assess the cost of correcting such condition and all expenses incident thereto (including the cost of publication, if any, herein provided for) as tax against the property on which such condition existed or from which such condition arose, as the case may be; and carry such tax on the regular tax rolls of the District, and collect such tax in the same manner as general taxes in said District are collected; *Provided,* That the correction of any condition aforesaid by said [Mayor] under authority of this section shall not relieve the owner of the property on which such condition existed, or from which such condition arose, from criminal prosecution and punishment for having caused or allowed such unlawful condition to arise or for having failed or refused to correct the same.

At the hearing before the Board, DHCD's witness Butler testified as to the feasibility of restoring gas and water in a makeshift fashion to petitioners' apartments. He also indicated DHCD's readiness to provide these services, pursuant to § 5–313, should the owner fail or refuse to do so. In their Joint Reply Brief, petitioners state that "the City did and continues to provide these services, despite the finding of the Board that it was impossible to restore services." It is apparent, then, that petitioners currently are being furnished cooking gas and water, albeit at the instance of the government rather than the landlord. It is true that § 5-313 is framed in discretionary language, so that the District is under no mandatory obligation to continue providing such services on a permanent basis. *Compare Masszonia v. Washington,* 315 F.Supp. 529, 532 (D.D.C.1970) (although the city's authority under § 5-313 may be labelled "discretionary," its mere existence implies a duty to act when an emergency situation exists), *with Masszonia v. Washington,* 321

applied the injury in fact analysis "to promote sound judicial economy" and in recognition of the concept "that an adversary system can best adjudicate real, not abstract, conflicts").

F.Supp. 965, 971 (D.D.C.1971) (court could not hold as a matter of law that it is an abuse of the city's discretion under § 5-313 to fail to provide utilities on a permanent, continuing basis). Nevertheless, the mere possibility that petitioners may have their interim utility services discontinued at some point in the future is an insufficient basis to confer standing upon them for purposes of this case. Rather than being immediate and concrete, petitioners' injuries are at most speculative. *See Public Citizen v. Lockheed Aircraft Corp., supra,* at 141–45, 565 F.2d at 716–17; *M & M Transportation Co. v. U. S. Industries, Inc.,* 416 F.Supp. 865, 868–69 (S.D.N.Y.1976).

 As long as petitioners continue to receive utility services, any dispute as to the liability for their delivery rests solely between the government and BGM.[14] Although the Housing Code unquestionably was designed to protect tenants' interests (as well as the public health and safety), the government has the primary responsibility to enforce it. Similarly, when a landlord seeks a variance from what he asserts is an unreasonable notice to correct Code violations, the resolution of that problem lies between the landlord and the government. The Housing Code neither provides for nor recommends the tenants' participation in these matters.[15] When a Housing Code case has run its course and has become final at the administrative level, the DCAPA permits "[a]ny person . . . adversely affected or aggrieved" by that final action to seek review in this court. D.C.Code 1978 Supp., § 1–1510. We eschew deciding whether individuals such as petitioners might have standing as "persons" notwithstanding the fact that they were not "parties" in the agency proceeding. *Cf. DeLavey v. Rental Accommodations Commission,* D.C.App., 411 A.2d 354, 359 (1980); *Smith v. Murphy,* D.C.App., 294 A.2d 357, 359 n.2 (1972). Assuming arguendo that petitioners could have status as "persons" within the meaning of § 1–1510, nonetheless they must satisfy each prong of the standing test that has evolved from the Supreme Court's interpretation of the federal APA.[16] Because petitioners have not demonstrated any concrete and immediate injury in fact from the action from which they have appealed, thereby failing the most fundamental of the standing tests, we dismiss their petition for review for want of jurisdiction.[17]

*Dismissed.*

FERREN, Associate Judge, dissenting:

I respectfully dissent, for I cannot agree that petitioners fail to satisfy the requirements for standing in this court.

In concluding that petitioners have not established an injury in fact sufficient to give them standing, my colleagues ignore the harm the Board's decision has done to petitioners' interest in occupying habitable housing. The Housing Regulations of the District of Columbia, 5G DCRR §§ 2401, 2405, require the owner of residential premises to provide and maintain plumbing facilities and utilities. The District is to enforce these regulations, with a view to protecting the community from hazards jeopardizing the public health, safety, welfare and morals. *See id.,* § 2101.

---

14. By noting this, we do not intend to imply that petitioners necessarily have any legal right to receive these utilities, nor is it our function to take any position as to the wisdom of furnishing them in circumstances such as these. As earlier noted, petitioners' legal status vis–a–vis their landlord is the subject of collateral proceedings which are not now before us. *See* note 1, *supra,* and accompanying text.

15. As noted above, however, in housing cases which reach the Board of Appeals and Review, tenants may be permitted to intervene, in the discretion of the Board. *See* note 9, *supra.*

16. *See* note 12, *supra,* and accompanying text.

17. Although we thus do not reach the merits of this appeal, we feel constrained to observe that our review of the record reveals no bad faith on the part of the landlord, BGM. There is nothing in the record indicating that BGM's attempt to evacuate the entire Garfield Hills complex has been other than a necessary step towards a bona fide effort to replace the central heating system. The record does not reflect why petitioners have so persistently resisted BGM's eviction efforts in the face of substantial financial incentives to accept relocation.

Obviously, residents in housing that does not conform to the regulations are injured in fact by an owner's refusal to provide essential services. It follows that the tenant–petitioners here were injured in fact by the Board's decision not to enforce the regulations requiring the owner of their building to provide utilities. They clearly have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination...." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

My colleagues apparently would agree but for one fact: the District has elected to provide petitioners with gas and water pursuant to D.C.Code 1973, § 5–313 [1]–a decision which my colleagues believe moots petitioners' standing. I disagree. Section 5–313 permits the Mayor to assume responsibility for eliminating housing code violations and to charge the property owner for the cost of doing so. The District, however, is under no legal obligation to undertake this responsibility; the plain language of the statutes states that it is within the discretion of the District to provide–and thus to withdraw–the utilities.[2] It is inconceivable to me that the District's election to provide such services for the time being under § 5–313 moots petitioners' interest in enforcing the Housing Regulations against the only entity that can be legally bound to provide them, namely the owner of the building. That interest is especially well illustrated by the following reality: at any moment, the District could decide to discontinue its provision of utilities. This would leave the tenant–petitioners without any legal recourse, since the owner–the only party with a statutory duty to maintain utilities–is having its rights determined by virtue of this very proceeding. In other words, there will be no way for petitioners to contest a utilities cut-off against the landlord once the District has elected to discontinue its support under § 5–313. Under these circumstances, petitioners unquestionably comply with the jurisdictional prerequisites of our statute, D.C.Code 1978 Supp., § 1–1510, as persons "suffering a legal wrong, or adversely affected or aggrieved by an order or decision" of the Board (1) denying the tenants an opportunity to have their say in the variance proceeding and (2) granting the landlord's requested variance.

In summary, I cannot agree with my colleagues' premise that petitioners are not harmed by the Board's decision; for that decision conclusively denies an enforceable order that the landlord provide heat and water, leaving petitioners instead to the grace of the District government. It follows that petitioners have standing to ask this court to review the merits of their petition.[3]

1. "Whenever the owner of any real property in the District of Columbia shall fail or refuse ... to correct any condition which exists on or has arisen from such property in violation of law or of any regulation made by authority of law ... the [Mayor] of the District of Columbia *may*, and he *is authorized to,* cause such condition to be corrected[.]" D.C.Code 1973, § 5–313 (emphasis added).

2. Although a district judge held that the District of Columbia is obligated to provide emergency services for a short term if the owner is beyond the effective power of the court, that same court concluded that the District cannot be ordered to provide such services on a long–term basis, or to make repairs. *See Masszonia v. Washington*, 321 F.Supp. 965, 970–71 (D.D. C.1971), *dismissed as moot and remanded*, 155 U.S.App.D.C. 159, 476 F.2d 915 (1973).

3. By evaluating injury in fact only with reference to whether petitioners were, or were not, being supplied with utilities–a focus on the merits of the controversy–my colleagues glide over the fact that there are actually two separate questions of injury presented: whether petitioners were (1) "aggrieved" by the Board's denial of their Motion for Leave to Intervene, and (2) "aggrieved" by the merits of the Board's decision that B.G.M. is no longer required to provide gas and water. Courts, as well as scholars, have recognized that denial of a petition to intervene in an agency's proceeding creates, in itself, an aggrievement entitling the petitioners to judicial review *of that denial,* without regard to *whether that petitioner* would have standing to seek review of the merits of the agency action. *See NLRB v. Majestic Weaving Co., Inc.*, 344 F.2d 116, 117 (2d Cir. 1965); 3 K. Davis, Administrative Law Treatise, § 22.08 at 241–43 (1958); Shapiro,

*Some Thoughts on Intervention before Courts, Agencies and Arbitrators*, 81 Harv.L.Rev. 721, 728 (1968).

It follows that, if the court were to conclude the agency did abuse its discretion in denying intervention, there would have to be a remand for a new proceeding; the court could not at that time rule on the merits of the petitioners' alleged injury, before they had been given an opportunity (by way of intervention) to try to convince the agency in the first instance, with the help of traditional testimony and argument.

If, however, the court were to conclude that the agency did properly deny intervention, the court would then have to inquire whether the agency's decision on the merits nonetheless "adversely affected or aggrieved" the petitioners, D.C.Code 1978 Supp. § 1–1510, so as to confer standing to contest the merits. By dealing only with this latter question, my colleagues implicitly have decided the first question: that the Board did not abuse its discretion in denying intervention. I have no quarrel with that conclusion.