Alan R. NEWBY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6692.

Court of Appeals of Alaska.

Nov. 13, 1998.

Rehearing Denied Dec. 7, 1998.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and MANNHEIMER and STEWART, JJ.

### OPINION

MANNHEIMER, Judge.

In 1993, Alan R. Newby was convicted of murdering a Fairbanks man named Mark Lacy. Three years later, Newby petitioned the superior court for post-conviction relief. In his petition, Newby asserted that he received ineffective assistance from his trial attorney, Dick Madson. Newby contended that Madson might have defended him better in various ways, but Newby's primary allegation was that Madson should not have represented him at all because Madson had a conflict of interest.

Superior Court Judge Mary E. Greene found that Madson had not had a conflict of interest, and she further found that Madson's representation of Newby had been competent in all other respects. Judge Greene therefore denied Newby's petition.

Newby now appeals the superior court's ruling. For the reasons explained here, we affirm the superior court.

### Facts of the case

In February 1991, Mark Lacy was discovered in his trailer with a single gunshot wound to his head. There was no sign of a forced entry and no evidence of a struggle. Moreover, most of Lacy's belongings were undisturbed. The only items missing from the trailer were Lacy's car, some firearms, and a telephone.

Newby was arrested after he was found in possession of Lacy's car. The missing telephone was discovered at Newby's residence. While he was in custody, Newby attempted to sell two shotguns that were identified as similar to the ones taken from Lacy's home.

In February 1992 (about a year after the homicide), Newby told a fellow inmate that he had shot and killed a man. Several weeks later, Newby told a different inmate that he had killed a man in Fairbanks. Newby said that he had shot this man in the head during an argument, and that he had stolen various items from the residence—a 9–mm. handgun (which Newby identified as a "Tech–9"), a camera, and a car.

Newby was indicted for Lacy's murder and for the theft of the property from Lacy's residence. He hired Dick Madson to represent him.

### Newby's claim that Madson had a conflict of interest.

Newby asserts that, when Madson was defending him, Madson had a conflicting loyalty. According to Newby, this conflicting loyalty stemmed from Madson's ties to another attorney, Kenneth Covell, and Covell's ties to a man named Glen Wood.

### (a) Madson's ties to Covell

Madson rented office space to Covell. The two attorneys kept their files and their finances separate, but Covell would sometimes stand in for Madson at court hearings when Madson was unavailable. For this service, Covell received a credit ($30 per hour) against his rent.

Covell in fact attended several hearings on Madson's behalf in Newby's case: the omnibus hearing, a trial-setting conference, and proceedings during Newby's first trial to discuss certain communications from the jury. Nothing of substance occurred at the omnibus hearing and the trial-setting conference. The jury communications, on the other hand, ultimately led the court to declare the jury hung and to declare a mistrial. Thus, Covell was acting as Newby's legal representative when the superior court issued the order that ended Newby's first trial. However, according to Judge Greene's later findings, it was Newby who was "adamant that the jury be declared hung and a mistrial occur".

In addition to Covell's willingness to appear in court for Madson, the two attorneys would sometimes confer on legal issues or tactics in their respective cases. Moreover, Covell would sometimes voluntarily give Madson a portion of the fees he received in particular cases.

*(b) Covell's ties to Glen Wood, and Wood's ties to the murder prosecution*

At the same time that Madson was defending Newby in the murder prosecution, Covell was pursuing a civil lawsuit against the State of Alaska on behalf of a man named Glen Wood. This lawsuit was peripherally connected to Mark Lacy's death.

Following Lacy's death, while Lacy's house was cordoned off for investigative purposes, Wood contacted the State Troopers and informed them that a safe was hidden beneath the floorboards of Lacy's house. Wood told the troopers that the safe was his and that it contained $10,000. Wood explained that he had been storing the safe in Lacy's house, and he asserted that only four people knew about the safe: Wood himself, Wood's girlfriend, Wood's ex-wife, and Lacy.

Alerted by Wood, the troopers located and retrieved the safe. However, the safe was locked, and Wood refused to help the troopers open it; the troopers therefore procured the services of a locksmith. When the troopers opened the safe, they found approximately $11,000 in cash. They also found plastic bags with trace amounts of cocaine. The State refused to relinquish the money to Wood, claiming that the money was subject to forfeiture because it represented proceeds from the illegal sale of drugs.

Wood hired Covell as his lawyer and sued the State to obtain the money. As noted above, Wood's lawsuit was pending at the same time that the State was prosecuting Newby for Lacy's murder. Covell did all the work in Wood's case, but Covell conferred with Madson about the case because Madson had another, unrelated case that raised similar issues.

In addition to his lawsuit against the State, Wood had a separate, more direct link to the murder prosecution: he was the owner of one of the firearms stolen from Lacy's residence at the time of the murder. As noted above, Newby told a fellow inmate that he had shot a man in the head during an argument, and that he had stolen a 9–mm. handgun (which Newby identified as a "Tech–9") from the man's residence. Wood had lent a "Tech–9" to Lacy. For this reason, the government called Wood as a witness at grand jury and at both of Newby's murder trials. However, Wood did not testify concerning the safe at either of Newby's trials, nor was any other evidence about the safe introduced at those trials.

*(c) Newby's allegations in the petition for postconviction relief*

In his petition for post-conviction relief, Newby asserted that Madson was incapable of giving his full loyalty to Newby because Covell was representing Wood in the civil suit against the State, and because Wood was a government witness in the murder prosecution. According to Newby, Madson's conflicting loyalty arose either (1) from Madson's on-going relationship with Covell (which Newby analogized to a partnership), or (2) from Madson's expectation of financial gain from any successful conclusion of Wood's lawsuit against the State.

Newby further asserted that Madson's conduct of the murder defense had been tainted by this conflicting loyalty. Newby first argued that, because Madson's "partner" (Covell) was representing an adverse witness (Wood), Madson was obliged to disclose this fact and obtain Newby's consent. Newby next contended that there was plausible evidence linking Wood to Lacy's murder, but that Madson declined to raise this defense because any suggestion that Wood was the murderer would harm Covell's chances for a successful conclusion of Wood's lawsuit to recover the $11,000. Newby also argued that there was plausible evidence that Lacy was a cocaine dealer, thus raising the possibility that some unknown person had murdered Lacy during a cocaine deal that went bad. Again, Newby asserted that Madson declined to investigate or present this defense because such a defense would tend to jeopardize Wood's civil lawsuit. (That is, evidence that Lacy was a cocaine dealer would tend to support the government's position that the $11,000 recovered from the safe was in fact money derived from the illegal sale of drugs.)

*(d) Judge Greene's findings*

After an evidentiary hearing, Superior Court Judge Mary E. Greene concluded that

Newby had failed to show that Madson's representation of Newby was affected by any conflicting loyalty. She issued a written order in which she made the following findings:

When Newby and Madson discussed trial strategy, Newby urged Madson to advance the defense that (1) Lacy was a cocaine user and possibly a cocaine dealer, and (2) Lacy had been murdered during a drug sale (by someone other than Newby). Madson investigated this defense, but he found no credible evidence to support it. Later, in Newby's petition for post-conviction relief, Newby listed the names of various people who (he asserted) could testify that Lacy either used or sold cocaine. However, Newby never told Madson about these potential witnesses.

Madson also considered and rejected the theory that Lacy had been murdered by someone (perhaps Glen Wood) who had wanted to steal the money from the safe. Madson in fact interviewed Wood during his investigation of this potential defense. However, Madson learned that Wood had been out of town when Lacy was killed. Moreover, Madson was unable to find any evidence that anyone else knew of the safe's existence (anyone other than Wood, Lacy, and the two other people that Wood named). Additionally, Lacy's house was left undisturbed—indicating that no one had actively searched for the safe.

In sum, Madson recognized the potential relevance of the safe, the money, and the trace amount of cocaine, but (for the reasons detailed above) he ultimately chose not to introduce evidence concerning the safe and its contents. Judge Greene concluded that Madson's decision was "based on tactical reasons unconnected with Covell's representation of Wood" in the civil suit.

Judge Greene did not decide whether Madson's office-sharing arrangement with Covell constituted the equivalent of a law firm or partnership. Instead, she concluded that even if Madson's arrangement with Covell should be deemed a "firm" for conflict of interest purposes, no active conflict of interest had been shown.

Judge Greene found that Madson had no conflict of interest with regard to Wood and his civil suit against the State. Madson never spoke with Wood about the suit, and all of the legal work was handled by Covell. Madson received no money from the settlement of this lawsuit.

Judge Greene recognized that *Covell* had a potential conflict of interest when he substituted for Madson and appeared on behalf of Newby at the omnibus hearing, the scheduling hearing, and the jury-communication hearings that ultimately resulted in the declaration of a mistrial at Newby's first trial. However, Judge Greene found that Covell's loyalty to Wood did not affect Covell's actions or decisions on behalf of Newby at these hearings. Thus, Judge Greene concluded, the actions and decisions taken by Madson and Covell on behalf of Newby were not influenced by Covell's representation of Wood.

*(e) Allegations of conflict of interest: what must be proved, and who bears the burden of proof?*

Before we review the merits of Judge Greene's ruling, we must resolve a preliminary question: which party—Newby or the State—bore the burden of proof in the superior court? Newby asserts that Judge Greene's findings are flawed because she improperly placed the burden of proof on Newby.

Newby's underlying claim is that he received ineffective assistance of counsel because his attorney had a conflict of interest. Logically, such a claim potentially comprises three elements:

1) that the attorney had a loyalty to someone else or, alternatively, some personal interest at stake in the case;

2) that the attorney's loyalty to someone else (or the attorney's self-interest) actively conflicted with the attorney's loyalty to the defendant, in the sense that this outside loyalty or self-interest actually affected the attorney's preparation or presentation of the defendant's case; and

3) that if the attorney had not allowed this conflicting loyalty or self-interest to affect his or her representation of the

defendant, then the outcome of the case would have been different.

Despite the fact that, logically, a conflict-of-interest claim comprises these three elements, the United States Supreme Court held in *Cuyler v. Sullivan*[1] that, as a matter of federal constitutional law, defendants should not be forced to prove the third element. If a defendant proves that their attorney labored under a conflicting interest, and if the defendant also proves that this conflicting interest actually affected the attorney's actions or decisions in the defendant's case, then the defendant is entitled to relief regardless of whether the defendant can show "prejudice"—can show that the outcome of the case was affected by the attorney's tainted actions or decisions.[2]

However, *Sullivan* also held that when a defendant does not raise a conflict-of-interest claim until after trial, the defendant bears the burden of proving elements 1 and 2—proving that the attorney had a conflicting loyalty and that this conflicting loyalty actually affected the attorney's actions or decisions.[3] Alaska law is somewhat different.

In *Moreau v. State*[4], the Alaska Supreme Court held that, whenever two or more co-defendants are represented by the same attorney, the trial judge has a duty to advise these defendants of the risks of joint representation and to inquire if, being advised of these risks, the defendants still wish to be represented by the same attorney. If the trial judge fails to conduct this inquiry (or if the appropriate waivers are not obtained from the affected defendants), then if one of these defendants later claims that their attorney's representation was affected by a conflict of interest, it is the *State* that bears the burden of *disproving* element 2 beyond a reasonable doubt. That is, the State must prove beyond a reasonable doubt that the attorney's multiple loyalties did not affect the

attorney's representation of the complaining defendant. (In such cases, element 1 is obviously a foregone conclusion.)

In *State v. Celikoski*[5], this court applied the *Moreau* rule to a slightly different situation. *Celikoski* involved two defendants who were ostensibly represented by two different attorneys, one from Alaska and the other from out of state. However, the Alaska rules of court require an out-of-state attorney to associate with an Alaska attorney.[6] Unbeknownst to Celikoski, Celikoski's own attorney was acting as the Alaska associate of his co-defendant's out-of-state attorney. In that capacity, Celikoski's attorney consulted with the out-of-state attorney about the co-defendant's case.[7] We held that, under such circumstances, *Moreau* supplied the governing rule: the State bore the burden of proving that this conflict of interest had not affected the representation Celikoski received from his attorney.

> [I]n order to qualify for post-conviction relief, Celikoski need[ed] only [to] establish that [his attorney] had undertaken the dual representation and that the trial judge did not "personally advise [Celikoski] of [the] potential dangers inherent in dual representation." *Moreau*, at 284. Once Celikoski proved this, ... "the burden [then shifted] to the state to prove beyond a reasonable doubt that a prejudicial conflict did not exist." *Id.*

*Celikoski*, 866 P.2d at 142.[8]

On one level, it may seem surprising to apply the *Moreau* rule to the situation presented in *Celikoski*. The *Moreau* rule was created for cases in which two or more defendants appear in court represented by the same attorney. This circumstance puts both the judge and the State on notice that there is a potential problem, and the trial judge is motivated to conduct the mandated inquiry

---

**1.** 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

**2.** *Id.*, 446 U.S. at 349–350, 100 S.Ct. at 1719.

**3.** *See id.*, 446 U.S. at 348–49, 100 S.Ct. at 1718.

**4.** 588 P.2d 275, 284 (Alaska 1978).

**5.** 866 P.2d 139 (Alaska App.1994).

**6.** *See* Alaska Civil Rule 81(a)(2)(a)-(b).

**7.** *Celikoski*, 866 P.2d at 140.

**8.** Bracketed text indicates an editorial change by this court; the text in braces appeared in brackets in the original.

because, if the trial judge fails to do so, any ensuing conviction is much more subject to collateral attack. But requiring a trial judge to advise defendants of the dangers of joint representation, and requiring a trial judge to obtain waivers from the affected defendants, seemingly makes sense only if the trial judge is on notice that there is a problem. In *Celikoski*, the trial judge was unaware that Celikoski and his co-defendant were represented by the same attorney; indeed, Celikoski was likewise unaware of his peril. And so, of course, the judge made no inquiry.

On another level, however, there is good reason to make the government shoulder the burden of proof in cases like *Celikoski*. The defendant in *Celikoski* was obviously in much more need of protection than the defendants in *Moreau*—because, unlike the defendants in *Moreau*, Celikoski did not know that his attorney was simultaneously representing a co-defendant. Such a conflict potentially infects every major aspect of the representation: planning the defense strategy, investigating the case, deciding whether to seek or accept a negotiated settlement, deciding how to present and argue the case, and (if the client is convicted) deciding how to approach sentencing.[9] When a defense attorney operates under such a fundamental and pervasive conflict of interest, the effectiveness of the representation and the fairness of the defendant's trial are placed in grave doubt. In these circumstances, we could properly require the highest degree of proof that the defendant suffered no adverse affect before we set our judicial imprimatur on the defendant's conviction.

Newby argues that, because he was unaware of Madson's potential conflicting loyalty to Wood, his case should be governed by the same rule we applied in *Celikoski*. According to Newby, once he showed that Madson had a potentially conflicting loyalty to Wood, then it was the State's burden to prove beyond a reasonable doubt that Madson's loyalty to Wood had no effect on Madson's actions and decisions in Newby's case. The State responds that *Celikoski* has been "overruled" by the enactment of AS 12.72.040, which declares that "[a] person applying for post-conviction relief must prove all factual assertions by clear and convincing evidence."[10]

We conclude that we need not decide whether the holding in *Celikoski* has been superseded by statute. Even if *Celikoski* has survived the enactment of AS 12.72.040, *Celikoski* does not govern Newby's case. Instead, Newby's case is governed by our decision in *LaPierre v. State*.[11]

In *LaPierre*, different attorneys in the Public Defender Agency were representing LaPierre and another man named David Simmons. LaPierre's and Simmons's cases were unrelated, but the Agency nevertheless asked the trial court for permission to withdraw from LaPierre's case. LaPierre's assistant public defender asserted that the Agency faced a conflict of interest because LaPierre might be called as a witness in Simmons's case. The trial court denied this motion and ordered the Agency to continue representing both men.[12]

On appeal, LaPierre asserted that he had received ineffective assistance of counsel because his attorney (or, rather, his attorney's law firm, the Public Defender Agency) had a conflicting loyalty to Simmons. Apparently analogizing his case to *Moreau*, LaPierre argued that it was the State's burden to prove beyond a reasonable doubt that LaPierre's legal representation had not been affected by this alleged conflict of interest. This court rejected LaPierre's argument and instead held that it was LaPierre's burden to prove that the Public Defender Agency's loyalty to Simmons actually affected the Agency's representation of LaPierre.

> Even assuming [that LaPierre established] an actual conflict of interest . . . , he

---

9. *See State v. Olsen*, 258 N.W.2d 898, 905 (Minn. 1977) (cited in *Moreau*, 588 P.2d at 283 n. 26).

10. *See also* Alaska Criminal Rule 35.1(g), which provides (in pertinent part): "Unless otherwise required by statute or constitution, the applicant [for post-conviction relief] bears the burden of proving all factual assertions by clear and convincing evidence."

11. 734 P.2d 997 (Alaska App.1987).

12. *Id.* at 1003.

is incorrect in maintaining that a *per se* rule of reversal applies. We decline to find that reversal automatically follows upon a bare showing of conflict of interest. Our view reflects the position adopted recently by the United States Supreme Court in *Cuyler v. Sullivan* [citation omitted] and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. . .

In this case, LaPierre has, at most, demonstrated the existence of a conflict in the abstract. He has neither alleged nor demonstrated that his counsel "actively represented conflicting interests" or that the purported conflict "adversely affected his lawyer's performance." ... To the contrary, it appears that LaPierre was never actually called as a witness or required to testify at Simmons' trial. LaPierre has failed to make an adequate showing to justify a presumption of prejudice under the *Cuyler* [sic: *Sullivan* ] and *Strickland* standard.

*LaPierre,* 734 P.2d at 1003–04. In other words, when the alleged conflict of interest involved the potentially conflicting interests of clients in unrelated cases, then even though the potential conflict was explicitly brought to the trial judge's attention, we concluded that *Moreau* no longer provided the governing rule. Instead, we followed *Sullivan* and placed the burden of proof on LaPierre.

As explained above, *LaPierre* was a case in which the alleged conflict of interest arose from the fact that (1) two attorneys within the same law firm (2) were representing different clients in different cases, and (3) these clients had potentially conflicting interests. Newby's case is similar: Newby asserted that there was a substantial link between his attorney (Madson) and another attorney (Covell), and that this other attorney had a client (Wood) who potentially could be called as a witness at Newby's trial. The one significant difference between Newby's case and *LaPierre* is that Newby faced an additional legal hurdle: the State did not concede that Madson and Covell were so closely affiliated that a conflicting interest of one should be imputed to the other.

If *LaPierre* governs Newby's case, then Newby bore the burden of proving (1) that Madson had a conflicting loyalty to Wood (through Covell), and (2) that this conflicting loyalty actually affected Madson's representation of Newby. Seeking to avoid this result, Newby argues that he is entitled to application of the *Moreau* rule (under which the State bears the burden of proof) because, like the defendant in *Celikoski,* Newby remained ignorant of his attorney's potential conflict. We conclude, however, that Newby's lack of awareness is not the deciding factor.

The difference between *Moreau* and *Celikoski,* on the one hand, and *LaPierre,* on the other, is the type of conflict presented. *Moreau* and *Celikoski* involved a particularly egregious type of conflicting interest: an attorney who owed simultaneous and equal loyalty to two defendants in the same criminal litigation. *LaPierre,* on the other hand, involved an assertion of conflict that could be made more frequently: the assertion that the defendant's attorney was affiliated in some way with another attorney, and that this other attorney had a client whose interests did not coincide with the defendant's interests.

██ We held in *LaPierre* that, even though the defendant had brought this potential conflict directly to the attention of the trial judge, it was still the defendant's burden on appeal to prove (1) that the alleged conflict of interest really existed, and (2) that this conflicting interest actually affected the defense attorney's representation of the defendant. We reach the same legal conclusion in Newby's case. It was Newby's burden to prove that Madson had a conflicting loyalty and that this conflicting loyalty actually affected Madson's representation of Newby.

*(f) Are Judge Greene's findings clearly erroneous?*

As explained above, Judge Greene ruled that Newby had failed to prove that Madson had a conflicting loyalty to Wood and that this outside loyalty affected his representa-

tion of Newby. Because (as explained in the preceding section) we agree with Judge Greene that Newby bore the burden of proof on these questions, the remaining issue is whether Judge Greene's findings are clearly erroneous.[13]

Newby renews his argument that the affiliation between Madson and Covell constituted a "firm", so that any conflicting loyalty that Covell owed to Wood should be imputed to Madson. Judge Greene did not directly rule on this issue. However, given Judge Greene's findings of fact concerning the relationship between Madson and Covell, Alaska law suggests that these two lawyers did not constitute a firm.

The commentary to Alaska Professional Conduct Rule 1.10 highlights certain hallmarks of a "firm": (1) lawyers who represent themselves to the public as one professional entity, (2) lawyers who have a formal agreement among themselves concerning the management of their practice and the sharing of income, and (3) lawyers who have mutual access to confidential information concerning each other's clients. The commentary adds, "[T]wo practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm." [14]

■ Under these guidelines, it appears that Madson and Covell did not constitute a "firm" for the purpose of imputing Covell's client loyalties to Madson. However, like Judge Greene, we find it unnecessary to decide this issue. Even assuming that Covell's loyalty to Wood could somehow be imputed to Madson, Newby failed to show that Madson's conduct of his defense was actually affected by the potentially conflicting loyalty to Wood.

Judge Greene found that Madson had actively considered and investigated the potential relevance of the safe hidden in Lacy's house (and the money and traces of cocaine found in that safe). She also found that Madson had concluded, for reasons unaffected by any supposed loyalty to Wood, that it would not be fruitful to build Newby's defense upon this evidence.

At Newby's urging, Madson investigated the possibility that Lacy was a cocaine dealer who had been murdered in connection with a drug deal. Madson found no credible evidence to support such a defense. When Newby litigated his action for post-conviction relief, he asserted that various witnesses were available who could testify that Lacy was a cocaine dealer; however, Newby never supplied this information to Madson.

Similarly, Madson considered the possibility that Wood had killed Lacy to recover the money in the safe. However, Madson discovered that Wood had been out of town when Lacy was murdered. Moreover, if Madson were to argue that Wood killed Lacy to recover the safe, Madson would have to explain why Wood left the safe in Lacy's house and then called the State Troopers to ask their assistance in recovering it.

Finally, Madson considered and investigated the possibility that Lacy had been murdered by someone else (other than Wood) who knew about the safe and the money. However, Madson was unable to discover any evidence indicating that the presence of the safe was known to anyone outside the four people mentioned by Wood: Wood, his girlfriend, his ex-wife, and Lacy. And if Madson were to argue that someone else had come to Lacy's house to steal the safe, he would have to explain why Lacy's house was undisturbed.

Judge Greene's findings of fact concerning Madson's investigation and planning of Newby's defense support the judge's ultimate conclusion that Madson's representation of Newby was not affected by any supposed loyalty to Wood. Newby has not shown that Judge Greene's findings of fact are clearly

---

13. *See Donnybrook Building Supply v. Interior City*, 798 P.2d 1263, 1266 (Alaska 1990) (a trial court's findings concerning the underlying facts will be upheld unless they are clearly erroneous). *See also* Alaska Civil Rule 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the oppor-

tunity of the trial court to judge the credibility of the witnesses."

14. Comment to Alaska Rule of Professional Conduct 1.10, "Definition of 'Firm'", first paragraph.

erroneous. We therefore uphold Judge Greene's findings, and, like Judge Greene, we conclude that Newby failed to prove that Madson's representation was affected by any conflicting loyalty.

*Newby's claims that Madson, apart from any conflict of interest, represented him incompetently.*

Apart from allegations of conflict of interest, Newby asserts that Madson represented him incompetently when Madson (1) failed to dispute the State's evidence concerning the time of Lacy's death, (2) failed to adequately investigate the possibility that Lacy's murder was a drug-related homicide, and (3) failed to call certain witnesses on Newby's behalf. After hearing Newby's allegations, Judge Greene concluded that Newby had failed to prove that Madson's actions fell below the range of competency expected of criminal law practitioners.

 Under *Risher v. State* [15], a defendant who alleges ineffective assistance of counsel must demonstrate that their attorney failed to "perform at least as well a lawyer with ordinary training and skill in the criminal law". The law presumes that an attorney has acted competently, and that the attorney's decisions were prompted by sound tactical considerations.[16] To prevail in a post-conviction relief action based on ineffective assistance of counsel claim, the defendant must rebut this presumption.

In the superior court, Newby did little other than argue that Madson should have done more investigation and should have pursued several of Newby's own defense theories (including the theory that Lacy was killed by someone who was upset by a drug transaction). In answer to Newby's claims, Madson explained that he did not have any witnesses to corroborate Newby's theory that Lacy had been a drug dealer, nor did he have credible witnesses to support any of Newby's other theories regarding Lacy's death. The record suggests that Madson, after investigating and rejecting these theories, decided to focus on rebutting and discrediting the State's evidence rather than trying to discover alternative killers.

 The record shows that Madson considered Newby's theories of the case, conducted a reasonable investigation of the case, and then formulated a reasonable defense strategy. Like Judge Greene, we conclude Newby failed to prove that he received ineffective assistance of counsel.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

**15.** 523 P.2d 421, 424 (Alaska 1974).

**16.** *See State v. Jones,* 759 P.2d 558, 569 (Alaska App.1988).