STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLANT, V.
JACK E. HARRIS, APPELLANT AND CROSS-APPELLEE.
735 N.W.2d 774

Filed July 27, 2007. No. S-06-062.

James R. Mowbray and Jerry L. Soucie, of Nebraska
Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

McCORMACK, J.

## NATURE OF CASE

After a trial by jury, Jack E. Harris was convicted of first degree murder and use of a deadly weapon to commit a felony in connection with the killing of Anthony Jones. We affirmed Harris' conviction in *State v. Harris*[1] (*Harris I*). After *Harris I*, Harris filed for postconviction relief. In *State v. Harris*[2] (*Harris II*), we reversed the collateral order of the post-conviction court which summarily denied postconviction relief on certain claims, and we remanded the cause for an evidentiary hearing. After an evidentiary hearing, the postconviction court denied Harris' motion for postconviction relief. Harris now appeals from that judgment.

## BACKGROUND

The facts surrounding Harris' trial and conviction are fully set forth in *Harris I* and *Harris II*, and are repeated here only as relevant. The principal evidence against Harris at trial was the confession of his accomplice, Howard "Homicide" Hicks, and the testimony of three inmates at the jail where Harris was incarcerated that Harris admitted to killing Jones with the assistance of someone named "Homicide."

An Omaha police detective, Leland Cass, also testified at the trial. Cass described an interview with one of the inmate witnesses during which the inmate first revealed that Harris had admitted to Jones' murder. The State pointed out that the report of the inmate interview did not identify Hicks by his given name, but referred to "Homicide," and foundation was laid to establish that "Homicide" and Hicks were the same person. The State then asked: "And at any point in time, Detective, were you able to establish whether or not this defendant Jack Harris

---

[1] *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002).

[2] *State v. Harris*, 267 Neb. 771, 677 N.W.2d 147 (2004).

knew Howard Hicks as Homicide?" Cass answered, without objection, that he did. Cass did not otherwise elaborate on this statement, but instead went on to testify as to his interview with another of the inmate witnesses.

Upon inquiry during cross-examination, Harris' attorney discovered from Cass that the statement that Harris knew Hicks as "Homicide" was contained in a police report authored by Cass (the Cass report). It is now undisputed that although the State agreed to provide Harris with a copy of all police reports, the State failed to provide Harris with a copy of the Cass report prior to trial.

The report detailed Harris' statements during an interview with Omaha police officers and the Federal Bureau of Investigation in an unrelated drug trafficking investigation. Harris' statements during the interview were made pursuant to a proffer agreement with the U.S. Attorney's office which stated that Harris' statements during the interview would not be used against him.

The Cass report details that Harris was able to name a number of people involved in drug trafficking, including Hicks. Harris identified Hicks by the nickname "Homicide." Harris did not discuss, in that interview, the Jones murder or any information directly relating to that murder.

Based on the prior nondisclosure and alleged inadmissibility of the report, Harris' counsel argued that he was entitled to a *Jackson v. Denno*[3] hearing on the voluntariness of Harris' statement that he knew Hicks as "Homicide." Counsel also argued that the failure to disclose constituted a violation of *Brady v. Maryland*[4] and that the statement was inadmissible because of the proffer agreement, although he later said he had "misspoke" with regard to the allegation of a *Brady* violation. Counsel moved for a mistrial. Counsel stated that had he been informed of the statement earlier, he would have filed a motion to suppress. Counsel did not move for a continuance.

---

[3] See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964).

[4] See *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

The court denied Harris' motions. The court did, however, express its concern that the statement had been obtained after the proffer agreement. Therefore, despite the court's conclusion that the statement was "innocuous," the court offered Harris the option of either having Cass' testimony stricken from the record or cross-examining Cass on the issue.

Harris chose to cross-examine Cass. On cross-examination, Harris elicited testimony from Cass that Harris had never indicated to Cass that Harris knew Hicks personally. Rather, Harris indicated only that he had heard of Hicks by his nickname. Cass testified that he did not know how Harris had learned Hicks' nickname, and Cass did not have any personal knowledge that Harris was actually acquainted with Hicks.

In the direct appeal of his convictions and sentences, Harris raised the failure of the trial court to conduct a *Jackson v. Denno* hearing on the voluntariness of his statement that he knew Hicks as "Homicide," but we held that the court had not abused its discretion, in the absence of dispositive proof as to whether the prosecution actually failed to provide Harris with the Cass report.[5]

Thereafter, Harris filed a postconviction motion alleging, among other matters, violations of his constitutional rights because of the late disclosure of the Cass report and the jury's having heard the statement that Harris knew Hicks as "Homicide." The postconviction judge granted an evidentiary hearing on some of the issues presented by Harris' postconviction petition, but denied a hearing on others. In an interlocutory appeal, we reversed the postconviction court's denial of an evidentiary hearing on the issue of prosecutorial misconduct relating to the late disclosure of the Cass report.[6] On remand, a full evidentiary hearing was held and the court ultimately denied postconviction relief. Harris now appeals the postconviction court's order.

Further facts will be set forth below, as necessary to our analysis.

---

[5] *Harris I, supra* note 1.

[6] *Harris II, supra* note 2.

## ASSIGNMENTS OF ERROR

Harris assigns that the trial court erred (1) when the trial judge granted the State's motion for recusal based solely on his comments regarding our decision in *Harris I*; (2) in failing to grant postconviction relief on the basis that Harris had been denied his right to a *Jackson v. Denno* hearing on the admissibility of his statement in the Cass report and on the grounds that his statements were used against him at trial to negate an essential point of the defense, in violation of Harris' statutory right to move for suppression of involuntary statements[7] and the 5th, 6th, and 14th Amendments to the U.S. Constitution; (3) in failing to grant postconviction relief based on prosecutorial misconduct in failing to disclose the Cass report in violation of the Due Process Clause of the 14th Amendment and the decision in *Brady v. Maryland* and its progeny; (4) in failing to grant postconviction relief based on a conflict of interest created by George Thompson, who was an associate at the law firm of Fabian & Thielen, where Harris' trial attorney, Emil M. Fabian, worked, leaving the Fabian & Thielen law firm and joining the Douglas County Attorney's office in violation of the 6th and 14th Amendments; and (5) in failing to grant postconviction relief based on the fact that during the representation of Harris by Fabian & Thielen, one of Fabian's associates left that firm and joined the Douglas County Attorney's office in violation of the Nebraska "bright line" rule.

The State cross-appeals, asserting that the postconviction court erred in permitting Harris to amend his postconviction motion to include the conflict of interest claim because such amendment exceeded the order of remand in *Harris II*. Harris moves for summary dismissal of the State's cross-appeal.

## STANDARD OF REVIEW

■ On appeal from a proceeding for postconviction relief, the lower court's findings of fact will be upheld unless such findings are clearly erroneous.[8]

---

[7] Neb. Rev. Stat. § 29-115 (Reissue 1995).

[8] *State v. Wagner*, 271 Neb. 253, 710 N.W.2d 627 (2006).

## ANALYSIS

### Alleged Prejudice Relating to Cass Report

We first address Harris' assignments of error relating to the Cass report. Harris argues that because of the State's prosecutorial misconduct in failing to disclose the Cass report in a timely manner, the jury was allowed to hear testimony as to Harris' inadmissible prejudicial statement that he knew Hicks by his nickname "Homicide." Harris explains that this statement should have been suppressed before being heard by the jury, but because Harris was unaware of the report, he could not make a timely motion to suppress. Harris asserts that his due process rights under the 14th Amendment to the U.S. Constitution were thus violated. He also asserts his Fifth Amendment rights were violated, apparently in reference to the privilege against self-incrimination. We note that although Harris' amended petition for postconviction relief made several allegations of ineffective assistance of trial counsel, Harris does not assign or argue in this appeal that the postconviction court erred in denying these ineffective assistance claims.

 Postconviction relief is a very narrow category of relief.[9] In a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable.[10] The appellant in a postconviction proceeding has the burden of alleging and proving that the claimed error is prejudicial.[11]

Harris argues that his constitutional rights were violated, rendering his conviction void or voidable, by invoking the principles (1) requiring a voluntariness hearing under *Jackson v. Denno*, (2) prohibiting nondisclosure of exculpatory evidence under *Brady v. Maryland*, and (3) prohibiting late disclosure of material evidence under Neb. Rev. Stat. § 29-1912 (Reissue 1995). The question of whether a constitutional error has occurred may differ depending upon the constitutional principles

---

[9] See *State v. Barnes*, 272 Neb. 749, 724 N.W.2d 807 (2006).

[10] *State v. Moore*, 272 Neb. 71, 718 N.W.2d 537 (2006).

[11] *State v. Brunzo*, 262 Neb. 598, 634 N.W.2d 767 (2001).

invoked. Harris' burden to show that he was prejudiced is the same, regardless of what constitutional provision he is claiming was violated.

Ultimately, the only prejudice which Harris asserts is the fact that the jury heard the statement that Harris knew Hicks as "Homicide." This, in turn, Harris argues, "forced" trial counsel to abandon Harris' theory of defense that Harris and Hicks did not even know each other.[12] Harris does not assert that the late disclosure of the Cass report impeded the ability of defense counsel to timely prepare Harris' defense. Harris' counsel did not make a motion to continue the trial in light of the late-discovered report. In fact, it appears that the contents of the report, if not the existence of the report itself, were already known to the defense. This is only reasonable, given that Harris was a participant in the interview with Cass and presumably knew what happened during it.

Assuming, without deciding, that a constitutional error occurred, Harris has failed to sustain his burden on postconviction review to show that the constitutional error was prejudicial. The statement complained of was that Harris knew Hicks as "Homicide." It is unclear whether this statement was brought forth in an attempt to reconcile testimony as to who "Homicide" was or whether it was meant to establish a relationship between Hicks and Harris. In any event, Harris' attorney, on cross-examination of Cass, clearly established that Harris had indicated to Cass only that he had heard of Hicks and that he knew his nickname was "Homicide." Cass specifically testified during cross-examination that Harris never said he knew Hicks personally. Thus, the cross-examination mitigated any prejudice that might have resulted from the more ambiguous statement made by Cass on direct examination. There is scant evidence that Harris' defense strategy was that Hicks and Harris did not know each other, but, in any event, such a strategy was not irreparably harmed, given the cross-examination.

■ A court making the prejudice inquiry in a postconviction proceeding must ask if the defendant has met the burden of showing that the decision reached would reasonably likely

---

[12] Brief for appellant at 42.

have been different absent the errors.[13] The postconviction court found that there was nothing in the Cass report that could have led to other evidence, to help prepare defense witnesses, or could have been used to impeach a prosecution witness. The postconviction court further concluded that the statement from the report entered into the record did not materially influence the jury. In summary, the postconviction court found that Harris did not suffer any actual prejudice in relation to the late disclosure of the Cass report. We agree. In light of the other evidence presented at trial, including the testimony of Hicks and three witnesses who stated that Harris had admitted to the crime, we conclude that Harris has failed to meet his burden on postconviction to prove that the claimed constitutional errors relating to the Cass report were prejudicial. The postconviction court thus properly denied postconviction relief on the issues pertaining to the Cass report.

### CONFLICT OF INTEREST OF TRIAL ATTORNEYS

Harris also claims that trial counsel's imputed conflict of interest warrants postconviction relief. After our remand of the cause in *Harris II*, the county attorney requested leave to withdraw as counsel for the State and requested the appointment of a special prosecutor. The basis for the request was that Thompson, the associate at the same law firm as the attorney representing Harris at trial, had been hired by the Douglas County Attorney's office. This was the first time that Harris' postconviction counsel was aware of this, and counsel was granted leave to amend the motion for postconviction relief to include claims based on this conflict of interest.

The evidence at the postconviction hearing regarding the conflict of interest was that Thompson was an associate at the firm where Harris' trial attorney worked. Thompson's relationship with the firm was somewhat akin to an office-sharing arrangement. The firm did not actually pay Thompson. Thompson was responsible for bringing his own cases to the firm, and he set his own fee schedule and generated his own income. At the

---

[13] *State v. Boppre*, 252 Neb. 935, 567 N.W.2d 149 (1997), *disapproved on other grounds, State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998).

end of the month, Thompson would pay half of his earnings to the firm and he would keep the other half.

Thompson testified that although he knew that Fabian had been appointed to represent Harris, Thompson never met with Harris, never did any legal work on Harris' case, and did not recall having any confidential information relating to Harris' case. The only connection Thompson had with the case was voluntarily attending a preliminary hearing, in the courtroom gallery, to learn how such matters were handled. Although both Thompson and Fabian stated that it was possible they had informal conversations about Harris' case, neither specifically recalled any such conversation.

In December 1998, Thompson left Fabian & Thielen to accept employment with the juvenile division of the county attorney's office. Thompson primarily worked on termination of parental rights cases. Thompson had no direct contact with the criminal division of the county attorney's office, which was located in a different building from where Thompson worked. Thompson testified that he never discussed the Harris case with anyone in the county attorney's office.

The postconviction court ultimately found that Thompson did not have any confidential information regarding Harris' case. In addition, the postconviction court found that during the entire period in question, Thompson "was effectively screened off" from the entirely separate criminal division of the county attorney's office, located in a different building. The court thus concluded that no actual conflict of interest of the attorneys involved in Harris' trial existed and that there was no basis for postconviction relief.

 Harris correctly notes that under *Strickland v. Washington*,[14] there is a limited presumption of prejudice if a criminal defendant can show (1) that his counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance.[15] But

---

[14] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[15] *Id.* See, also, *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); *State v. Schneckloth*, 235 Neb. 853, 458 N.W.2d 185 (1990).

Harris' reliance on principles of imputed conflict of interests is misguided. The U.S. Supreme Court, in *Cuyler v. Sullivan*, has held that "the possibility of conflict is insufficient to impugn a criminal conviction."[16] In order to obtain relief in a postconviction action based upon the alleged conflict of interest of trial counsel, the defendant must show an actual, as opposed to an imputed, conflict of interest.[17] We determine that the postconviction court did not clearly err in concluding that no actual conflict of interest was present in this case. As such, Harris has no conflict of interest claim which warrants postconviction relief.

The State's cross-appeal asserts that the postconviction court lacked the power to allow Harris' motion to amend the postconviction petition with the conflict of interest allegations. The State argues that issue was not within the purview of our mandate in *Harris II* remanding the cause for an evidentiary hearing. Having affirmed the denial of postconviction relief on other grounds, we need not reach this issue.

## TRIAL JUDGE'S RECUSAL

Finally, we address Harris' argument that the court committed reversible error in the postconviction proceedings when the trial judge granted the State's motion to recuse himself from presiding. At a hearing on the recusal motion, the State called a witness who testified that the trial judge had previously expressed his view that this court should have reversed for a new trial in *Harris I*. Also, the trial judge's court reporter testified that the trial judge had expressed his view that we should have granted a new trial in *Harris I* and that the trial judge was inclined "to grant a postconviction relief for the defendant." The court reporter was unsure, however, whether the trial judge's statements referred to the ultimate result of postconviction proceedings, or only to the decision to grant an evidentiary hearing on Harris' petition for postconviction relief. The trial judge

---

[16] *Cuyler v. Sullivan, supra* note 15, 446 U.S. at 350.

[17] See, *Com. v. Padden*, 783 A.2d 299 (Pa. Super. 2001); *Newby v. State*, 967 P.2d 1008 (Alaska App. 1998); *State v. Walden*, 861 S.W.2d 182 (Mo. App. 1993). See, also, *State v. Narcisse*, 264 Neb. 160, 646 N.W.2d 583 (2002); *State v. Schneckloth, supra* note 15.

concluded that "a reasonable person might conclude that as the finder of fact in this case, I am predisposed." The trial judge stated that this required him to grant the State's motion, and he accordingly entered an order of recusal. The postconviction action was then reassigned to another judge.

Citing the First Circuit cases of *Blizard v. Frechette*[18] and *In re Union Leader Corporation*,[19] Harris argues that the trial judge had a duty to remain as the judge for the postconviction action absent objective facts requiring his removal. He asserts that the facts alleged at the recusal hearing were insufficient to require his removal. Harris asserts that the trial judge is uniquely situated to understand the issues relating to a post-conviction action and that parties must be prevented from too easily obtaining a strategic disqualification.

■ Because the trial judge is uniquely situated to understand the issues relating to a postconviction action, it is true that we do not condone recusals based on the simple fact that the post-conviction judge was also the judge at trial. However, it does not follow that a defendant has a cognizable right to have the trial judge be the judge presiding over a postconviction action. Generally, while a defendant may be entitled to an impartial judge,[20] a defendant does not have the right to have his or her case heard before any particular judge.[21] Harris does not contend that the postconviction judge was not fair and impartial or that the recusal resulted in prejudicial delay.

■ A motion to disqualify a trial judge on account of prejudice is addressed to the sound discretion of the trial court.[22]

---

[18] *Blizard v. Frechette*, 601 F.2d 1217 (1st Cir. 1979).

[19] *In re Union Leader Corporation*, 292 F.2d 381 (1st Cir. 1961).

[20] *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972).

[21] *Palmore v. United States*, 411 U.S. 389, 93 S. Ct. 1670, 36 L. Ed. 2d 342 (1973); *Sinito v. United States*, 750 F.2d 512 (6th Cir. 1984); *United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974); *Padie v. State*, 566 P.2d 1024 (Alaska 1977); *Lane v. State*, 226 Md. 81, 172 A.2d 400 (1961). Cf. *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005).

[22] *State v. Terrell*, 220 Neb. 137, 368 N.W.2d 499 (1985).

A judge must be careful not to appear to act in the dual capacity of judge and advocate.[23] We find no abuse of discretion in the trial judge's decision to recuse himself in this case.

## CONCLUSION

For the reasons already stated, we affirm the denial of post-conviction relief. Harris' motion for summary dismissal of the State's cross-appeal is denied.

AFFIRMED.

HEAVICAN, C.J., not participating.

---

[23] *Jim's, Inc. v. Willman,* 247 Neb. 430, 527 N.W.2d 626 (1995), *disapproved on other grounds, Gibilisco v. Gibilisco,* 263 Neb. 27, 637 N.W.2d 898 (2002).

HANNON, Judge, Retired, concurring in part, and in part dissenting.

I agree with the majority's opinion on all of the points considered by the majority's opinion except one. I must dissent from that portion of the opinion which concludes that the prosecutor's conduct was not prejudicial to Jack E. Harris. I understand that this court is bound by the finding of the trial court that the prosecutor did not deliver the report to the defense counsel and that her failure to do so was not deliberate. However, in my opinion, a combination of that unintentional conduct and the method of the prosecutor's direct examination of Officer Leland Cass enabled the State to get before the jury a crucial admission which appeared to be clearly inadmissible.

On direct examination, Cass was allowed to testify that he learned that Harris knew Howard Hicks by his nickname, "Homicide," which is a crucial fact when Harris was claiming he did not know Hicks. Because the prosecutor had not delivered the report which showed Cass learned of that fact as part of a proffer, defense counsel had no way of preventing that evidence from being presented to the jury, but the prosecutor would have had the report and must have interviewed Cass to learn of the basis of his testimony.

Viewed in the light of the other evidence, in my opinion, the admission of this evidence was very prejudicial. Cass' testimony

was that of a disinterested, reputable, and unimpeachable witness of a nonjudicial admission of a party. In my opinion, that is powerful evidence, usually dispositive of the point admitted by a party. An admonishment by the judge that the jury should disregard such evidence would be useless. Without Cass' testimony, the evidence before the jury was that Harris testified he did not have an association with Hicks at the time that Hicks testified that they murdered Jones together. The State had the unsupported testimony of Hicks that he did. Hicks' testimony on his association was weak and unsupported. The testimony that Harris admitted to the crimes was given by three jail inmates with obvious motives to lie.

Without the evidence obtained by the proffer statement, in my opinion, a jury would have difficulty in finding Harris to be guilty beyond a reasonable doubt. Therefore, I think the prosecutor's conduct was prejudicial to Harris' getting a fair trial.